## DUFF *v*. HOPKINS.

*District Court, W. D. Pennsylvania.* November 7, 1887.)

1. SPECIFIC PERFORMANCE—STATUTE OF FRAUDS—PROOF OF CONTRACT.
   A contract for the conveyance of land, although in compromise of pending litigation, will not be specifically enforced unless proved by the writing itself. where there has been no such part performance as to take the case out of the statute of frauds.[1]

2. SAME—MEMORANDUM—TELEGRAM.
   A telegram from a bank to its attorneys, "Our board have agreed to accept the proposition of L. B. Duff, assignee of Carrier & Baum," does not connect itself with an informal and unsigned memorandum which requires parol testimony, not merely *for its identification, but also to show that it was an offer* from the assignee.[1]

3. SAME—MEMORANDUM—INCOMPLETE WRITING.
   A writing which is the mere basis for and preliminary to a contract which is to be put into definite shape. and executed if the terms are approved by a bankrupt court. is not a completed agreement, enforceable specifically.[2]

4. COMPROMISE—ORDER OF COURT—EFFECT.
   An order of a bankrupt court, made upon the *ex parte* application of the assignee, approving the terms of an agreement of compromise, and authorizing the assignee to consummate the same, has no binding effect upon the other party to the proposed compromise.

[1] As to what is a sufficient memorandum of a contract relating to lands to satisfy the statute of frauds, see Love's Ex'rs v. Welch, (N. C.) 2 S. E. Rep. 242; Doherty v. Hill, (Mass.) 11 N. E. Rep. 581; Elliot v. Barrett, (Mass.) 10 N. E. Rep. 820, and note; Higham v. Harris, (Ind.) 8 N. E. Rep. 255; Hastings v. Weber, (Mass.) 7 N. E. Rep. 846; Falmouth & L. T. Co. v. Shawhan, (Ind.) 5 N. E. Rep. 408; Welch v. Darling, (Vt.) 7 Atl. Rep. 547; Dumn v. Rothermel, (Pa.) 3 Atl. Rep. 800; Banks v. Manufacturing Co., 20 Fed. Rep. 667, Wardell v. Williams, (Mich.) 28 N. W. Rep. 796; Camp v. Moreman, (Ky.) 2 S. W. Rep. 179; Insurance Co. v. Oliver, (Ala.) 2 South. Rep. 445; Webster v. Brown, (Mich.) 34 N. W. Rep. 676; Sheley v. Whitman, Id. 879; Hollis v. Burgess, (Kan.) 15 Pac. Rep. 536; Morrison v. Dailey, (Tex.) 6 S. W. Rep. 426; Roehl v. Haumesser, (Ind.) 15 N. E. Rep. 345.

[2] See foot-note on next page.

5. SPECIFIC PERFORMANCE—WHEN ENFORCED—MUTUALITY.
    Specific execution will not be decreed in favor of the plaintiff where the
    contract is not in like manner enforceable against him, nor binding upon him.[1]
6. VENDOR AND VENDEE—BREACH OF CONTRACT—INJUNCTION.
    If the plaintiff's case, upon a contract to convey land, is not one for specific
    performance, a court of equity will not grant an injunction to restrain a
    breach or disaffirmance of the contract, nor make a decree declaring it to be
    obligatory upon the defendant.

In Equity. Application for an injunction and other relief.

*Levi Bird Duff*, for complainant.

*John H. Orvis* and *Charles H. McKee*, for defendant.

ACHESON, J. This is a suit in equity, brought by Levi Bird Duff, assignee in bankruptcy of Carrier & Baum, against Albert C. Hopkins. The case is complicated, and, for the proper understanding of it, a somewhat lengthy recital of facts is necessary.

John Carrier and Andrew F. Baum were adjudicated bankrupts by the district court of the United States for the Western district of Pennsylvania in June, 1874, and, in the following September, assignees of their estates were appointed. Each of the bankrupts, at the commencement of the proceedings in bankruptcy, was the owner of the undivided one-third of four tracts of land, viz: Warrant No. 13, situated partly in Jefferson county and partly in Clearfield county, and Warrant Nos. 1988, 2009, and 3592, situated in the latter county, all in said district; but the titles to this real estate passed to the assignees incumbered by several judgments, which the First National Bank of Wellsville, Ohio, had obtained in the United States circuit court for said district against the bankrupts, respectively, and other judgments in the same court against the bankrupts, which were subsequently assigned to the bank. After the adjudication, under the leave of the bankrupt court, writs of *scire facias* to revive all said judgments were issued, with notice to Richard Arthurs, the then sole assignee of the bankrupts, and judgments of revival were entered in the circuit court in the years 1878 and 1879. With like leave executions against John Carrier were then issued out of the circuit court, and the marshal levied upon and sold to James W. Reilly, the president of the bank, the Carrier interest, or undivided one-third, in said four tracts of land, and by his deed, dated August 25, and acknowledged in open court August 26, 1879, the marshal conveyed the same to said Reilly, who bought in trust for the bank. The bank also acquired tax titles to said lands after the adjudication in bankruptcy. The office of assignee having become vacant on April 12, 1880, by the resignation of Richard Arthurs, Levi Bird Duff, on that day, was appointed the assignee in bankruptcy. On January 5, 1882, the assignee last named filed a bill in equity in the circuit court of the United States

---

[1] Equity will not specifically enforce a contract wanting in definiteness or mutuality. Bourget v. Monroe, (Mich.) 25 N. W. Rep. 514; Hall v. Loomis, (Mich.) 30 N. W. Rep. 374; Moses v. McClain, (Ala.) 2 South. Rep. 741; Recknagle v. Schmalz, (Iowa,) 33 N. W. Rep. 365; Durkee v. Cota, (Cal.) 16 Pac. Rep. 5; Fogg v. Price, (Mass.) 14 N. E. Rep. 741; Appeal of Holthouse, (Pa.) 12 Atl. Rep. 340; Magee v. McManus, (Cal.) 12 Pac. Rep. 451.

for said district, to No. 11 May term, 1882, against the bank and other defendants, charging that some of the aforesaid judgments were without consideration, and all of them were fraudulently entered originally; that Arthurs, the assignee at the time the judgments were revived, was ignorant of their collusive character, and of the defenses thereto; and praying that said judgments and the revivals thereof, and executions thereon, and the title acquired by the marshal's sale, and also said tax titles, be declared null and void. The bank filed an answer in denial of the material allegations of the bill. Pending the taking of testimony in that suit, on November 28, 1883, the assignee in bankruptcy transmitted to the bank an unsigned paper containing terms of settlement, of which the following is a copy:

"Liquidate judgments of *Wellsville Bank* v. *Baum*, and against Carrier, at $45,000 by amicable *sci. fa.* to revive, with a stay on ½ for 6 months and ½ for one year. This to be in full of all claims of said bank against Carrier & Baum, as a firm, and against John Carrier and A. F. Baum, individually, and upon payment of these judgments the bank to surrender all claims which they hold against said parties as a firm or individually, whether by transfer by Smith & McGreggor, or otherwise, and for taxes or charges paid on their lands. The bank also to transfer to the assignee of Carrier & Baum the judgments it holds against Robert Osborn on the same paper they have judgment against Baum. The assignment to be made on the payment of the Baum judgments to the bank by the assignee. The bank also to convey to the assignee the Carrier title acquired by sale of U. S. marshal. Also the tax titles it holds on Carrier & Baum lands in Clearfield county. Also all interest that may be held by McLean, or those claiming under him, (except A. F. Baum and wife,) in the Carrier & Baum lands, (excepting the ⅓ of 2009.) Also to transfer its interest in Osborn's land, acquired by deed from U. S. marshal, viz., McGhea & McGary lands, Osborn tract, Garrison tract, and Mason tract, purchased in common with the Pittsburgh Savings Bank. The bank also to discontinue its suits against the assignee in Clearfield county, the assignee agreeing that, in the ejectment case all costs, including the receiver's expenses, shall be paid out of the fund in the receiver's hands, and that upon the division of the fund thereafter the Carrier & Baum ⅔ shall belong to the assignee, and he shall take thereout sufficient to pay the costs in the two partition cases brought by the bank, (amount not known, but small, certainly not exceeding $100,) and he shall also take out of said two-thirds belonging to Carrier & Baum a sufficient sum to pay the purchase money yet due on tract No. 13, viz., $3,511.35, and the remainder of said Carrier & Baum share shall be paid to the Wellsville Bank and be a credit on their debt of $45,000, they to have the option to credit it on any one of their judgments. The assignee to discontinue, or have dismissed at his costs, the bill against said bank, and others, now pending in the U. S. court. This settlement to be submitted to and approved by the district court of the United States, Western district. The bank to give the assignee notice on Friday evening, November 30th, of their acceptance or refusal of this settlement."

The minute-book of the bank, under date of November 30, 1883, shows a meeting of the board of directors, at which eight members were present, and contains the following entry:

"W. M. Hamilton submitted a statement furnished by Col. Duff, giving an outline of the basis of settlement of the claims against Carrier & Baum, etc.,

(see statement on file,) to which all the members present gave their hearty assent."

The parol testimony shows that the "statement" referred to in the said minute was the above-quoted paper, or a copy thereof. On the date last mentioned Mr. Reilly, the president of the bank, sent the following telegram to the bank's counsel at Pittsburgh:

"WELLSVILLE, OHIO, November 30, 1883.

"*To Brown & Lambie, Attys., Fifth Ave., Pitts., Pa.:* Our board have agreed to accept the proposition of L. B. Duff, assignee of Carrier & Baum.

"J. W. REILLY, Prest."

The contents of this telegram were communicated to the assignee by Brown & Lambie the same day, or soon thereafter.

The bank on February 27, 1882, had brought an action of ejectment in the court of common pleas of Clearfield county for the tract No. 2,009 against the Sandy Lick Gas-Coal & Coke Company (which was engaged in mining coal therefrom) and others; and in that suit a receiver had been appointed to collect the royalties payable on the mining operations. On December 6, 1883, under an order of that court, entered pursuant to an arrangement between the assignee in bankruptcy and the attorney of record of the bank acting by its instructions, the sum of $3,686.07 (the one-third or Carrier's share) of the net fund in the receiver's hands was paid to the bank, and the like sum of $3,686.07 was paid to L. B. Duff, as assignee of Baum. Of this latter sum the assignee paid $3,511.35 in discharge of the balance of purchase money due on the tract No. 13, and the residue, viz., $174.72, he paid to the bank,—making the whole amount thus received by the bank $3,860.79. On March 31, 1884, the assignee in bankruptcy and Brown & Lambie, the attorneys at law of the bank, signed a written agreement, of which the following is a copy:

"For the purpose of settling all controversies between the First National Bank of Wellsville, Ohio, and the estate of Carrier & Baum, bankrupts, it is hereby agreed by and between said bank and Levi Bird Duff, assignee of said estate, as follows, to-wit:

"That the judgments of said bank in the circuit court of the United States, Western district of Penna., against John Carrier and A. F. Baum be revived and liquidated at the sum of $45,000, with interest from November 30, 1883, less a credit of three thousand eight hundred and sixty and 79–100 dollars, ($3,860.79,) as of date of December 6, 1883, with stay of execution on one-half thereof until the first day of October, A. D. 1884, and on the balance until April 1, A. D. 1885. This to be full payment of all the claims of said bank against John Carrier and A. F. Baum, both as a firm and as individuals, whether held by said bank in its own right or by assignment from Smith & McGreggor, or otherwise howsoever, and for taxes or charges paid on the lands of said Carrier & Baum, except the costs upon said judgments, which shall be paid by the estate of said bankrupts. Upon the payment by the estate of said bankrupts to the First National Bank of Wellsville of the said judgments in the manner and at the times specified, the said banks shall satisfy said judgments, and release and discharge said estate from all claims and demands whatsoever, and shall also transfer and assign to said estate, by sufficient deed or deeds, all its interest in the lands in Clearfield county formerly belonging to John Carrier, and acquired by sale upon judgments against said Carrier in the circuit court of the United States, Western district, Pa., as per deed of

John Hall, U. S. marshal; also all the tax titles it holds for lands of John Carrier and A. F. Baum situated in Clearfield county, Pa.; also its interest in lands of Robert Osborn, acquired by deed of U. S. marshal, to-wit.: McGhee & McGary lands, the Osborn tract, the Garrison tract, and the Mason tract, purchased in common with the Pittsburgh Savings Bank: provided, however, that the undivided third of tract No. 2,009 (being the Osborn third) is not included in the lands to be transferred to said estate. The said bank also to convey to said estate all interest in said Clearfield county lands (excepting the one-third aforesaid) that may be held by George F. McLean, or those holding under him, (except A. F. Baum and Margaret Baum, his wife): provided, that said bank shall have the option of indemnifying the said estate against claims that may be set up to said lands by said McLean or those claiming under him, A. F. Baum and wife excepted. The said bank to discontinue all suits by it against said estate in Clearfield county, the costs in the ejectment case, including the receiver's expenses, shall be paid out of the funds in the hands of the receiver, and upon the division of the funds thereafter the Carrier & Baum ⅔ shall belong to said estate, and the assignee shall take thereout sufficient to pay the costs in the two cases of partition brought by said bank against said estate, and the balance of the royalty belonging to the Carrier & Baum ⅔, earned up to Dec. 1, 1883, (except the sum of $3,511.35, applied to the purchase money of No. 13,) shall be paid to said bank and credited on the judgments aforesaid, to be applied upon any judgment at the option of said bank. The said assignee agrees to discontinue or have dismissed as to said bank, without costs to the bank, the proceedings in equity in the circuit court of the United States, No. 11, May term, 1882, wherein Levi Bird Duff, assignee, is plaintiff, and the said bank and others are defendants.

"In witness whereof the parties hereunto set there hands this thirty-first day of March, A. D. 1884. 
BROWN & LAMBIE,
"Attys. for First National Bank of Wellsville.
"LEVI BIRD DUFF,
"Assignee of Carrier & Baum."

At the foot of the foregoing agreement there is an added clause, bearing the same date and signed in the same manner, supplying some omissions not material to this case. No written authority in any form was ever given by the bank to Brown & Lambie to sign the foregoing agreement; nor is there satisfactory proof that they had authority of any kind from the bank, or from any of its officers, to execute the same. They seem to have acted upon their own judgment, and, as they believed, for the best interests of their client, assuming that, as the attorneys at law of the bank, they had the implied right to sign the paper.

Some time after the execution of the agreement of March 31, 1884, Mr. Lambie exhibited it, or communicated its contents, to Mr. Reilly, the president of the bank, and to several of the directors. At first these persons expressed to Mr. Lambie an objection to the extension of the time of payment of the stipulated sum beyond the period originally proposed, but, after hearing his explanation, they did not press the objection. None of the officials of the bank took any active step either in affirmance or disaffirmance of the action of Brown & Lambie in signing said paper. The board of directors of the bank never approved or ratified the agreement of March 31, 1884, nor was any action with respect to it taken by the board. Indeed, it does not appear that it was ever submitted to the board for action. On the twenty-sixth of April, 1884,

Mr. Henderson, the cashier of the bank, wrote a letter to Brown & Lambie about the taxes on the Clearfield county lands, in which he said: "We suppose this will be attended to by Col. Duff, under arrangement made with him. Please see that the matter is attended to in time." The contents of this letter being communicated to the assignee, he paid the taxes on two-thirds of the tracts, viz., $874.50, in the succeeding month of May.

As early as October 29, 1883, the bankrupt court granted leave to the bank to sue out writs of *scire facias* for the second revival of its judgments, and to prosecute the same with notice to the assignee. Such writs were subsequently issued, and judgments of revival were entered in the several cases at various dates between December 4, 1883, and August 5, 1884. The judgments were severally revived for the whole amount thereof, without any stipulation as to stay of execution.

The assignee did not pay or tender to the bank the installment, or any part thereof, which, by the terms of the agreement of March 31, 1884, was payable on October 1, 1884. To excuse this failure it is said that the bank had not yet obtained the title of George F. McLean. But the bank was not bound to convey the title until the second installment was due. In fact, however, the bank had acquired McLean's title through a sheriff's sale in September, 1884. True, it is alleged, and perhaps correctly so, that the sheriff's sale did not divest an interest in the timber granted by McLean to one De Witt. But even if this was the fact, still the bank had the right to indemnify the estate of the bankrupts against all claimants under McLean.

On the thirteenth of January, 1885, the said bank and James W. Reilly, as its trustee and individually, as parties of the first part, and the said Albert C. Hopkins, as party of the second part, executed a written agreement, whereby the first parties agreed to sell and convey to Hopkins all their right, title, and interest in and to all the lands hereinbefore mentioned, and to assign and transfer unto Hopkins all the bank's aforesaid judgments; and in consideration thereof Hopkins agreed to pay the first parties the sum of $45,000, as follows, viz.: $10,000 in hand, $7,500, with interest, in one month, $7,500, with interest, in two months, and $20,000, with interest, to be secured by negotiable paper, in six months. This agreement contains the clause following:

"It is expressly understood and agreed that the said conveyances and transfers are to be made by the parties of the first part, and are to be accepted by the party of the second part, subject to any rights which Levi Bird Duff, assignee in bankruptcy of Carrier & Baum, may have under an agreement made by said Levi Bird Duff, assignee of Carrier & Baum, with Brown & Lambie, attorneys for the First National Bank of Wellsville, Ohio, bearing date March 31, 1884, not admitting, however, that Levi Bird Duff, assignee as aforesaid, has any legal rights or claims under said agreement. And it is also expressly understood and agreed that the party of the second part will take said conveyances and transfers subject to the result of the proceedings in equity in the circuit court of the United States for the Western district of Pa., to No. 11, May term, 1882, wherein Levi Bird Duff, assignee of Carrier & Baum, is plaintiff and the First National Bank of Wellsville, Ohio, *et al.*, are defendants."

Hopkins having made his payments, and fully complied with the terms of said agreement, the bank and J. W. Reilly, before the bringing of this suit, executed and delivered to him conveyances of their titles to said lands, and assignments of said judgments.

The proposition for settlement which the assignee made to the bank in November, 1883, was never submitted to the court for its approval, nor was the agreement of March 31, 1884, so submitted until May 29, 1885. On this last date the assignee presented to the court, sitting in bankruptcy, his petition setting forth that he had entered into an agreement of compromise with the attorneys of the bank, and attached to his petition a copy of the agreement of March 31, 1884; and he prayed the court to fix a time for hearing his petition, and that on such hearing, "an order be made authorizing him to enter into said agreement of compromise with said bank." Upon that petition such proceedings were had that on September 5, 1885, the bankrupt court approved the compromise, and authorized the assignee to consummate the same, and carry it into full effect.

The assignee in bankruptcy has paid no portion of the money payable to the bank under the agreement of March 31, 1884, nor has he ever tendered or offered to pay that money, or any part of it. The equity suit in the circuit court was not discontinued. Nothing therein has been done since November 28, 1883, but the suit is still pending. The purposes of the present suit, which was commenced on December 2, 1885, are disclosed by the specific prayers of the bill, which are as follows:

"(1) That said A. C. Hopkins be restrained, first by preliminary and afterwards by perpetual injunction, from selling any of the lands of said bankrupts, or either of them, on the execution now in the marshal's hands, or any other execution issued on the judgments he holds against said bankrupts. (2) That said composition, confirmed by this court, be decreed to be legal and valid, and binding upon the said A. C. Hopkins, and that he be restrained by injunction from asserting and claiming any title in or to the lands of said bankrupts herein described, and included in said composition, in contravention and denial thereof. (3) That said Hopkins be required to pay to said bankrupt estate such damage as it has sustained by reason of the opposition of said Hopkins to the carrying out of said composition, and the obstruction of the settlement of said estate."

It appears that some negotiations took place between the assignee in bankruptcy and the defendant for the sale by the former to the latter of the undivided two-thirds of the timber on two of said tracts of land, the defendant already being the owner of the other one-third thereof; but, the parties failing to agree, those negotiations were finally broken off early in the fall of 1884. The assignee then endeavored to make a sale of the timber to Crider & Son, and on October 14, 1884, gave them a 30 days' option to purchase the same, which option was extended 15 days. At the end of that period the Criders declined to purchase. The bill charges that Crider & Son, in the course of their examination of the title, "were met by the defendant, his agent, or attorneys, who, by false statements in regard to the assignee's title to said lands, induced Crider & Son to

believe that the assignee had no right to sell and could not convey said timber, and they, therefore, refused to purchase." And the bill further charges that "during the time that your orator was endeavoring to make sale of said lands to comply with said composition, and the said Hopkins, by himself and his agents and attorneys, by false reports of the title was preventing a sale, the said A. C. Hopkins was secretly negotiating with the said First National Bank of Wellsville, Ohio, for the purchase of the incumbrances and titles held by them, for the purpose of defeating said composition and subjecting the bankrupt estate to further litigation, with intent to delay and defraud the general creditors of said estate." All these charges are denied by the answer. The voluminous proofs bearing upon this part of the case I have carefully considered, and my clear conclusion is that the above-quoted charges are not substantiated.

The defendant's negotiations with the bank began early in January, 1885. Several months before that time all negotiations between the assignee and the defendant had ended. They had never been able to come to an agreement. No confidential relations of any kind then existed, or had ever existed, between them. For the failure of the assignee to make a sale to Crider & Son the defendant was not responsible. He had done nothing to preclude himself from buying the titles and judgments of the bank if he saw fit to incur the risks involved in the purchase. Of two such risks express mention is made in his contract with the bank, viz., his possible subjection to rights which the assignee in bankruptcy might have under the agreement of March 31, 1884, and the result of the pending litigation in the circuit court. Whether or not the defendant at or prior to the time he entered into his contract of January 13, 1885, had express notice of the assignee's proposition of settlement made to the bank in November, 1883, and the bank's action thereon, is disputed, and the evidence touching this matter is conflicting. But even if there was no such express notice, still, in view of all the proofs, the defendant, I think, must be treated as having learned enough to put him on inquiry, and, therefore, as having at least constructive notice of all that had transpired between the assignee and the bank looking to a compromise, and leading up to the agreement which the counsel of the bank signed on March 31, 1884. In the further consideration of the case, then, it will be assumed that the defendant took the titles and judgments of the bank subject to any equitable rights which the assignee in bankruptcy might have enforced against the bank had it not made the conveyances and transfers to the defendant.

The first question here naturally arising is whether there was any contract between the assignee and the bank which a court of equity would specifically enforce. In determining this, several matters deserve notice. In the first place, it is to be observed, that the principal subject-matter of the alleged contract was the conveyance by the bank of its titles to the designated tracts of land, and, notwithstanding the contract may have been in compromise of pending litigation, it was undoubtedly within the operation of the statute of frauds and perjuries. Now, specific perform-

ance of such a contract will not be decreed unless it is proved by the writing exclusively. *Soles* v. *Hickman,* 20 Pa. St. 180, 183; *Hammer* v. *McEldowney,* 46 Pa. St. 334. That is not a written contract which is not self-sustaining. Id. And where the terms of the contract are to be sought in two or more writings they must connect themselves together without the aid of parol testimony. Wat. Spec. Perf. § 233. Furthermore, when the writing is the mere basis for the contract, and not the contract itself, or any of the terms remain for future adjustment, or where the matter is left open and one party may withdraw from it, or there appears to be an intention to negotiate further, there is no binding agreement. Id. § 234. Let us apply these legal principles to the facts in this case. As Brown & Lambie signed the agreement of March 31, 1884, without written, or, indeed, any authority, it is quite plain that it can have no tendency to establish a written contract binding on the bank. The telegram of November 30, 1883, from the president of the bank to Brown & Lambie does not, I think, connect itself with the assignee's so-called proposition, which, it must be remembered, was an informal and *unsigned* memorandum, requiring parol testimony, not merely for its identification, but for the more vital purpose of showing that it was an offer from the assignee. These observations, it seems to me, also apply to the meager entry of November 30, 1883, on the minute book of the bank. But aside from these considerations, it is clear that the so-called proposition, the minuted assent and the telegram, were merely preliminary to a contract to be thereafter put in proper form and duly executed. They did not constitute a completed contract. The memorandum, as we have seen, was not signed by the assignee. It bound neither him individually nor the estate of the bankrupts, and was not intended to bind either. It was a fundamental condition expressed on the face of the paper that the settlement thereby contemplated should be approved by the bankrupt court. Without the direction of that court no binding contract of the kind could be entered into. Rev. St. § 5061. The contemporaneous entry on the minute-book of the bank designates the paper as a "statement" giving "an *outline* of the *basis* of settlement." The recorded assent thereto, viz., "to which all the members present gave their hearty assent," does not imply deliberate, final corporate acceptance of a proposition. That the foregoing views of these transactions are correct is indisputably established by the subsequent action of the assignee in joining with Brown & Lambie in drawing up and signing a formal agreement in writing, covering the whole subject-matter of the prior negotiations, but with an important modification of the terms originally suggested in respect to the time of payment. It was *this* agreement, and none other, which the assignee eventually submitted to the bankrupt court for approval, and which the court did approve. Upon the whole, then, I think it may be confidently affirmed that there was no contract in writing between the assignee and the bank to satisfy the statute of frauds. Nor was there any such part performance as would afford ground for equitable relief under this bill. Payment of purchase money in part or in whole does not take a case out of the statute, as it admits of direct com-

pensation. *Gangwer* v. *Fry*, 17 Pa. St. 491. This is a sufficient answer to any argument based on the payment of taxes and the appropriation made of the fund in the ejectment suit. As the bank, as the holder of the legal title to the Carrier interest, was entitled to the one-third of the fund in the hands of the receiver, it is not clear to me that the estate of the bankrupts was prejudiced by the disposition which was made of that fund. But if injured the matter can be rectified. It is, however, insisted that the bank received the benefit of the stipulation as to the revival of its judgments, and that this result was due to the forbearance of the assignee. But this affirmation rests upon a misapprehension of the rights of the parties. It is not to be doubted that for the preservation of its liens the bank had a right again to revive its judgments, and, hence, the bankrupt court had granted the bank leave to do so. Moreover, there was no defense to the writs of *scire facias* open to the assignee, for none of his supposed defenses were pleadable to those writs. *Benton* v. *Burgot*, 10 Serg. & R. 240; *Dowling* v. *McGregor*, 91 Pa. St. 410; *Maxwell* v. *Stewart*, 22 Wall. 77. Relief for the causes alleged was obtainable only on the equity side of the court. There the assignee's bill is still pending, and the second revivals are no obstacle whatever to its successful prosecution. If the original judgments should be overthrown the revived judgments will, of course, also fall.

But again: to entitle a party to specific performance the rule is that there must be mutuality both as to the obligation and the remedy. Wat. Spec. Perf. § 196; *Marble Co.* v. *Ripley*, 10 Wall. 340, 359; *Bodine* v. *Glading*, 21 Pa. St. 50; *Meason* v. *Kaine*, 63 Pa. St. 335. That rule applies here, and is decisive of the question under discussion. Id. In *Marble Co.* v. *Ripley, supra,* the court says:

"And it is a general principle that when, from *personal incapacity,* the nature of the contract, or any other cause, a contract is incapable of being enforced against one party, that party is equally incapable of enforcing it specifically against the other, though its execution in the latter way might in itself be free from the difficulty attending its execution in the former."

No one pretends that the assignee incurred individual liability, and to give the agreement in question any binding effect against him in his representative character, the consent of the bankrupt court was a *sine qua non*. Now, the assignee alone could invoke the authority of that tribunal. The bank had no standing in that forum for such purpose. It is idle to speculate as to what might have been the result had the assignee made a timely application to the court and obtained its sanction to the proposed compromise. The fact is that he did not move in the matter until after the expiration of the year within which the contemplated settlement should have been carried out to full completion. In the mean time the attitude of the parties had become one of antagonism. The bank, after the assignee was in clear default in his first payment, had conveyed its titles to the defendant, who from the first has repudiated the alleged agreement. It is scarcely necessary to add that the order of the bankrupt court of September 5, 1885, did not conclude the bank or the defendant. Neither was a party to that proceeding. The

order, indeed, was not an adjudication of the rights of any body, but was merely permissive—authorizing the assignee to act.

Still further: according to the settled doctrine of equity he who asks a specific execution of his contract must show a performance on his part, or an offer to perform. *Colson* v. *Thompson,* 2 Wheat. 336; *Boone* v. *Iron Co.,* 17 How. 340. But the plaintiff can show neither of these things. Even now he makes no offer to perform. Upon that subject his bill is altogether silent.

For the above reasons, then, I am of the opinion that the plaintiff has no right to a decree for the specific performance of the alleged contract. And, indeed, the bill is not framed with a reference to a specific execution. It contains no prayer for such relief. Nor at the bar did the plaintiff ask such relief under the general prayer. On the contrary, in his brief of argument, reasons are suggested why a bill for specific performance against the defendant would be "barren of results."

At first view, then, it might seem that the foregoing discussion of the question was a work of supererogation; but, upon reflection, it will be discovered that the question has a very close relation to the specific prayers of the bill. *Fothergill* v. *Rowland,* L. R. 17 Eq. 132. If the case is not one for specific enforcement what basis is there for the relief prayed?

The first prayer of the bill is for an injunction to restrain the sale of the lands of the bankrupts upon execution issued on the aforesaid judgments. This prayer, be it observed, is not coupled with any tender or offer to the defendant of the amount confessedly due thereon. It must be noticed, also, that the object is not to suspend execution until the determination of the equity suit pending in the circuit court. That measure of relief is attainable in that suit. The injunction here sought is a perpetual one. But if the alleged contract is not to be specifically executed, why should the defendant be perpetually restrained from proceeding on his judgments? Besides, the stay of execution given by the agreement of March 31, 1884, has long since expired, so that under the very terms of the alleged contract the defendant is entitled to proceed by execution.

The second prayer of the bill is that "said composition confirmed by this court" be decreed to be binding upon the defendant, and that he be enjoined from asserting or claiming any title to said lands in contravention and denial of the composition. In so far as this prayer assumes that the order of the bankrupt court made September 5, 1885, was obligatory upon the defendant, it proceeds upon an erroneous conception of its effect. But again: if the alleged compromise agreement is not to be specifically enforced, why make this decree? Clearly, it is not necessary in aid of any proceeding at law open to the plaintiff. What good purpose would be subserved by a decree so limited in its range,—so incomplete in results? To adjudge that the compromise agreement was binding on the defendant, and to enjoin him from asserting the contrary, and there to stop, would indeed be an "impotent conclusion" to this litigation. But, in truth, the reasons for denying specific execution hold good against the allowance of the decree contemplated by the second

prayer. In fine, when it is once shown that the plaintiff has no right to a decree for the specific performance of the alleged contract, it logically follows that he is not entitled to the relief sought by either the first or the second prayer of the bill.

Little need be said as respects the third prayer. There being no ground for granting to the plaintiff any relief of a purely equitable nature, the court has no jurisdiction with reference to a mere question of damages. *Root* v. *Railway Co.*, 105 U. S. 189. Under the proofs, however, I do not see that the defendant is answerable in damages for the causes assigned in this prayer.

Let a decree be drawn dismissing the plaintiff's bill, with costs to the defendant, payable out of the estate of the bankrupts.