BRUSH-SWAN ELECTRIC LIGHT CO. OF NEW ENGLAND *v.* BRUSH ELECTRIC CO.

(*Circuit Court, S. D. New York.* January 17, 1890.)

1. CONTRACT—MODE OF PAYMENT—MODIFICATION.

On a bill for specific performance of a contract granting complainant the exclusive agency for the sale of certain patented articles and apparatus to be furnished by defendant, the complainant's book-keeper testified that he was officially informed by defendant's president that defendant had agreed to wait for its pay for apparatus furnished until complainant's customers had paid therefor. It appeared that business was conducted in that way thereafter, and that shortly before, the contract granting complainant the territory, and agreeing to supply it with apparatus, had been continued, though it was known to be virtually insolvent. *Held* sufficient to show a modification of the contract as to mode of payment, though some correspondence between the parties seemed contradictory.

2. SAME—EFFECT OF MODIFICATION—WAIVER OF CONDITION.

By making, after the known virtual insolvency of complainant, an agreement recognizing and continuing the original contract, a provision of the original authorizing abrogation of the contract, after an arbitration showing that complainant's financial responsibility has become so impaired that defendant cannot safely do business through it, is waived, unless complainant's credit becomes further impaired.

3. SAME—ARBITRATION AND AWARD—CONTRACTOR'S FINANCIAL RESPONSIBILITY.

As the contract gave no right to security, refusal to furnish it was no ground for demand of arbitration as to complainant's financial responsibility.

4. SAME—TERMINATION—GROUNDS.

Defendant, having terminated the contract, and demanded arbitration as to complainant's financial responsibility because of its refusal to furnish security, cannot justify its breach on the ground that other causes existed which might have been made grounds for terminating the contract.

5. SAME—EXTENDING TIME OF PAYMENT—VALIDITY.

A promise by the patentee to extend the time of payment by a licensee for the articles to be furnished according to contract until the licensee's customers shall have paid therefor, which is made when the licensee is financially embarrassed, is valid.

6. PATENTS FOR INVENTION—LICENSE—SPECIFIC PERFORMANCE—INJUNCTION AND ACCOUNTING.

Where specific performance of an agreement giving a license and exclusive agency within certain territory for sale of a patented article cannot be enforced, the bill may be retained, and an injunction and accounting ordered; the defendant being by the contract prohibited from selling in the specified territory.

In Equity. Bill for specific performance.

*Joseph H. Choate* and *William G. Wilson*, for complainant.
*Albert Stickney* and *Gilbert H. Crawford*, for defendant.

Coxe, J.    This is an equity action for the specific performance of contracts between the parties, and also for an injunction and an accounting. On the 21st of May, 1878, the defendant, under the name, at that time, of the Telegraph Supply Company of Cleveland, Ohio, entered into an agreement with Charles M. Rowley and Thomas J. Montgomery, of Boston, Mass., the predecessors of the complainant, whereby they were given an exclusive agency and license for the sale, in New England, of dynamo-electric machines, and apparatus made by the Cleveland Company under various patents covering what was known as the "Brush System of Electric Lighting."    This agreement was to continue in force for 17 years from April 24, 1877, unless sooner abrogated by mutual agreement, or by a decision of a board of arbitration.    The ninth clause of the agreement is as follows:

"If at any time the pecuniary responsibility of the party of the second part becomes so impaired as not to be sufficient to enable the party of the first part to safely transact their business in said territory through them then this contract may be abrogated, provided that the question of the aforesaid pecuniary responsibility of the party of the second part must first be determined by the board of arbitration hereinafter named."

This board was to consist of a member chosen by each of the parties to the agreement and a third to be chosen by the two so selected.    Any matter in dispute was to be formally presented and tried, and the decision of the board, in writing, was to be binding upon the parties. . In the autumn of 1878 this contract, with the approbation of the defendant, was assigned by Rowley and Montgomery to the Brush Electric Light Company of New England.    In December, 1879, the territory covered by the May, 1878, agreement was largely extended, and, in June, 1880, a second contract, substantially like the first, but embracing the extended territory, was entered into between the parties.    On the 23d of February, 1882, a supplemental agreement was entered into between the Brush Electric Light Company of New England and the defendant, under its present name, by which the prior agreement was changed in certain matters of detail, the principal modification being the insertion of a clause prohibiting the defendant from selling in the licensed territory without the consent of the New England Company. On the 31st of May, 1882, all the contracts were assigned to the complainant—the Brush-Swan Electric Light Company of New England, and this company was accepted by the defendant as having succeeded to all the rights under the previous agreements.    In the spring of 1885, for the reason, *inter alia*, that the storage battery, which the defendant expected to furnish in connection with the Swan incandescent lamp, had not proved a success, the financial condition of the complainant was seriously embarrassed.    In these circumstances the complainant and defendant entered into an agreement, dated June 15, 1885, whereby the complainant transferred to the defendant all its property, of every name

and nature, except its franchise, office furniture and contracts with defendant and with the Swan Incandescent Electric Light Company of New York. At the same time it executed its promissory notes for $17,500, payable one year from date, and delivered them to the defendant in discharge of a balance found due. There was also a mutual release of all claims and matters growing out of the dealings between the parties prior to June 10, 1885. After this settlement the relations between the parties, under the original contracts, continued for over two years. In the summer of 1887 various propositions, looking to the assumption and control of the business by the defendant, were made and declined. The defendant thereupon began demanding security before filling orders, and declined to fill them without it. The complainant having refused to give security, the relations between the parties were severed by the defendant in the autumn of 1887. In determining who is to blame for this condition of affairs it is not necessary to go back of the agreement of June, 1885. At that time all differences were settled and each party obtained a clear bill from the other. Former misunderstandings were obliterated. The future was to be untrammeled by the past. The following propositions may be regarded as established: *First.* The prior contracts were recognized by the agreement of June, 1885, and were continued thereafter. *Second.* If its contracts and franchises are left out of view, the complainant, in June, 1885, was insolvent and remained so until the end. *Third.* The complainant did not perform the conditions of the original contracts as to payments, if those conditions remained unmodified. *Fourth.* If, by a subsequent modification, the complainant was not required to pay until it collected of its customers, it was guilty of no breach which justified the defendant in repudiating the contracts. It, therefore, becomes important at the outset to ascertain whether the contracts were modified.

The bill alleges "that the provisions of the original contract with said Brush Electric Company in regard to the mode of payment by your orator had been modified to this extent, that in cases of the installation of new plants your orator should make payments to said Brush Electric Company when and as it received payments from its customers. This modification was made in the year 1885, and was observed and remained in force until the time in 1887, when, as above stated, said Brush Electric Company violated said contracts." The answer denies the foregoing allegation, "except to this extent that such a modification of the modes of payment as is therein stated was allowed in a few specified cases for special reasons, but the general rule was not changed, and all of the special arrangements had been canceled and withdrawn by the defendant a considerable time before the said demand for arbitration." There is no dispute, either in the pleadings or in the proof, that in December, 1885, the president of the defendant met the president, and other officers, of the complainant in the latter's office and there entered into an agreement with them upon the subject of special discounts and credits. There is, however, a controversy as to the terms of the agreement. The only witness who testifies on the subject is Charles W. Spear, the complainant's

book-keeper. He says positively that the terms agreed upon were "that the Brush Electric Company of Cleveland were to be paid for all apparatus manufactured and furnished by them for the erection of new plants, immediately upon such plants being paid for by the customers of the Brush-Swan Company. The Brush Electric Company were to wait until the customer actually paid, even though a term of credit had been fixed, which expired. The Brush Company were to wait indefinitely for payment, until the customer had actually paid." No witness contradicts this testimony. It is asserted however, by the defendant that it is inconsistent with the correspondence between the parties, that the alleged agreement is unilateral, and, in view of the admitted financial condition of the complainant, it is beyond the limits of credulity to suppose that such conditions could have been agreed to by intelligent business men— which the complainant's officers certainly were.

The imprudence of the defendant dates back of the modification. The extension of the contracts in June, 1885, was an unwise proceeding, unless the defendant had implicit faith in the integrity and business ability of the officers of the complainant. The extension being once made, something very like the modification of December would seem to follow as a logical conclusion. From what possible source could the complainant, concededly insolvent, have drawn for remittances, except the payments received from its customers? The probabilities are not all, therefore, with the defendant.

But it is not a question requiring the court to indulge in guesswork and conjecture. An unimpeached witness has testified to the agreement in unqualified language. He says that its terms were officially communicated to him, by George W. Stockly, the defendant's president. Mr. Stockly, thus challenged, remains silent. When, in addition to the persuasive presumption thus created is added the fact that the business was transacted in accordance with this modification, it is entirely clear that it would be an unprecedented proceeding, arbitrarily to reject Mr. Spear's testimony, because expressions in the correspondence may seem inconsistent with it. Besides, taking the correspondence in its entirety, it cannot be said that the defendant, after December, 1885, ever refused to fill an order, or at any time asserted its right to terminate the contract on the sole ground that the stipulated credit had been exceeded. After that date the defendant did not draw, and the complainant did not accept, drafts payable in 75 days. The modification of December, 1885, must, therefore, be taken as a fixed fact.

The terms of the original contracts, which related to the submission of the question of pecuniary responsibility, were necessarily changed by the agreement of June, 1885. The parties contracted in the light of ascertained facts. The nature of their agreement cannot be arrived at without a reference to the then existing circumstances. The defendant knew that the complainant was insolvent. The evidence of this was in the defendant's hands. It knew that the complainant owed $17,500 and had absolutely nothing with which to pay, but some unsalable machinery and furniture, valued at $4,298. To assert that the defendant extended

the contracts intending presently to enforce the insolvency clause is to impute bad faith to the defendant. It did not intend, surely, to lure the complainant on to ruin. If the original contracts had been made at this time this clause would not have appeared at all in its present form. With the changed conditions and relations this clause was changed, necessarily. It was superseded for a time, and its drastic features were modified by the trend of events. The parties needed no arbitration to inform them of the complainant's insolvency. They knew it, and knowing it, the defendant elected to continue its business dealings with the complainant. If the clause was operative at all after that, it was so only when the defendant had done some act which still further weakened its responsibility. The language of the clause in question is: "If at any time the pecuniary responsibility of the party of the second part becomes so *impaired*," etc. This is only another way of saying that an arbitration may be asked if the responsibility of the complainant deteriorates, becomes worse, or is diminished in value. A credit which remains the same from year to year is not weakened or *impaired*. If the complainant remained as responsible thereafter, as it was on the 15th of June, 1885, the defendant had no right to complain. It chose to trust an insolvent, and should not be released because a board of arbitration certified to a fact which the defendant at all times knew and which the complainant at all times admitted. With the contracts thus modified, first by the Spear agreement, and second by the suspension and qualification of the responsibility clauses, the question remains, "Did the complainant perform them?"

It appears from the correspondence that the fault charged by the defendant was, not that the complainant was behind in payment for past sales, but that it declined to give security for future sales. If the complainant were in default for past sales the defendant could have insisted that these debts should be paid or secured. This it did not do. It insisted upon security before filling new orders, and based its right to do so, not upon past defaults but upon the fact, the existence of which had been known from the inception of the June agreement, that the complainant was not "fully solvent." The defendant, on the 3d of October, 1887, wrote as follows:

"We understand from all that has passed hitherto that you decline to give us the security we are justly entitled to, and we *therefore* ask that an arbitration be immediately had in exact accordance with the ninth and twelfth clauses in our contract with you, to which we refer you."

As the ninth clause is understood by the court, the right to an arbitration existed irrespective of the non-performance of the contracts. In other words, if, prior to June 15, 1885, the complainant's credit had become impaired, the defendant could have demanded an arbitration even though every provision of the contract had been performed to the letter. On the other hand if every provision had been violated the contract could not have been abrogated under this clause without proof of financial impairment. A clearly defined failure to perform on the part of the complainant would have made proceedings under this clause wholly unnecessary, as the contracts could then have been terminated

by reason of the complainant's breach, although its financial condition at the time might have been good beyond all question. The failure to assert and maintain a breach of the contracts, and the demand for arbitration, give rise to the inference that there was no breach on which the defendant deemed it prudent to rely, and that in demanding an arbitration it had taken the strongest position possible. If, under the contracts, the right to demand security in advance existed, the refusal to give it would have warranted the defendant in ending the contract instantly. Nothing else was needed. But as the contracts gave no such right the complainant's refusal furnished no basis for the demand for an arbitration. The evidence is quite clear that, if the complainant had made no money, it was certainly no worse off in September, 1887, than in June, 1885. It had been engaged during the interval in vigorously pushing its goods and the proofs show that it was doing a large and increasing business. There was nothing, therefore, upon which to found a request for arbitration even if the demand had been made before the right was forfeited, by the defendant's own breach of the contracts. At this time—September, 1887—there may have been something due from the complainant, but, from the manner in which remittances were made, it is not easy to say, positively, whether this was so or not. It is however quite certain that failure to remit was not one of the accusations advanced by the defendant. Even should it appear that some amount was due at that time, there was nothing in the relations between the parties which gave the defendant the right to terminate the contracts, suddenly, and without a word of warning or complaint in this regard. The power to abrogate the contracts was not pitched upon this ground. It may be, if money had been due, that the defendant could have notified the complainant that it would cease to do business unless the amount were immediately paid, and could have terminated the contracts if it were not paid. But in view of the manner in which remittances were made and accepted, something of this kind was necessary. For nearly two years the complainant remitted in round sums from time to time as it received money from its customers. The defendant accepted these remittances and at no time intimated that this mode of doing business was unsatisfactory. Without any change in the situation, the defendant refused to fill orders, unless security was given in advance, and, upon failure to receive it, repudiated the contracts.

It seems that the defendant must stand or fall upon its right to take this course. It is too late now to justify its acts by asserting that there were other faults of the complainant which might have been made available. If such faults existed they were venial in character and were waived or condoned. The complainant's insolvency and refusal to give security "were the reasons and *the only reasons* which led the defendant to ask for an arbitration." If the defendant founded its right to terminate the contracts upon an untenable ground it cannot justify its course upon the theory that complainant was guilty of other acts which might have been used as the basis of a complaint, if defendant had thought of them in time. It is said that the complainant did not furnish the in-

formation demanded by the defendant, but here, again, the defendant never at any time insisted that it had a right to abrogate the contracts for this reason. It did insist, and the complainant appears to have conceded its right to do so, that it was entitled to all information relating to the sale of its property which the complainant possessed. Several orders were delayed until this information was forthcoming. There is no evidence that the defendant ever refused to fill an order on this ground alone. The information seems to have satisfied the defendant sufficiently to induce it to accept the orders. After the letter of September, 1886, which was agreed to by the complainant, and so settled definitely certain matters previously in dispute, it is thought that there was no room for complaint against the complainant upon this ground.

The agreement of 1885 being a mere extension of the time in which payments were to be made was not void under the statute of frauds or otherwise. Such agreements have frequently been upheld. *Canal Co.* v. *Ray*, 101 U. S. 527; *Homer* v. *Insurance Co.*, 67 N. Y. 478.

A number of matters now involved in doubt might have been made clear if the court had had the benefit of the testimony of the chief actors in this controversy, but they have not been called on either side. Upon the record as presented the court is forced to the conclusion that the original contracts were modified in 1885 and, as so modified, have been performed by the complainant in all material matters.

The opinion was formed at the hearing that the argument of the defendant's counsel that these contracts are of such a character that they cannot be specifically enforced, was unanswerable. This opinion is still entertained, but it is thought that the bill may be retained for the purposes of an injunction and an account. *Sewing-Machine Co.* v. *Embroidery Co.*, 1 Holmes, 253. By the terms of the contracts the defendant is especially prohibited from selling in the designated territory any of the machinery in question. The exclusive right to do this is given to the complainant. If, from the nature of the agreement, the court cannot give the profits of this business to the complainant, it should, at least, restrain the defendant from reaping them, particularly where, as in this cause, the remedy at law is wholly inadequate. There should be a decree for the complainant for an injunction and an accounting.