Shipman, Circuit Judge.
This is an appeal from a final decree rendered by the circuit court for-the southern district of New York, which *38 was in general accordance with some of the prayers of the complainant’s bill for the specific performance of a contract. On May 21, 1878. the Telegraph Supply Company, now known,by the name of the Brush Electric Company, and hereinafter called the Cleveland Company, the defendant in this case, entered into a contract with Rowley & Montgomery, to whose rights the complainant, the Brush Swan Electric Light Company of New England, hereafter called the Brush Swan Company, succeeded. It was accepted as a contracting party in the place of its predecessor by the Cleveland Company on July 12, 1882. The Cleveland Company was the manufacturer of dynamo electric machines and apparatus, which were made under sundry patents which it also owned. By virtue of the contract of May 23,1878, and its amendments of June 21, 1880, and February 23, 1882, the Brush Swan Company became the exclusive licensee to sell these machines and apparatus within a specified territory. Its business was to furnish local electric companies or manufacturers or individuals, who required an extensive plant for electric lighting, with the'electrical machinery, apparatus, engines, wire, and equipment which they respectively needed, and with the labor necessary to put the same in position, and, as a rule, under a single contract for an entire plant. It bought from the Cleveland Company its machines, at a discount from the'price which was fixed by said manufacturer of at least 20 per cent., and was to accept drafts therefor payable in 75 days from delivery of the machinery at Cleveland, and to pay the drafts at maturity. The agreement was to continue for 17 years from April 24, 1877, unless sooner abrogated by mutual agreement or by the decision of arbitrators. The ninth article provides as follows:
“Ninth. If at any time the pecuniary responsibility of the party of the second part becomes so impaired as not to be sufficient to enable the party of the first part to safely transact their business in said territory through them, then this contract may be abrogated, provided that the question of the aforesaid pecuniary responsibility of the party of the second part must first be determined by the board of arbitration hereinafter named.”
If the Cleveland Company sold its machinery within the specified territory, it was to pay the Brush Swan Company the stipulated discount or commission thereon, which thus became, as a rule, the exclusive purchaser from the manufacturer of its apparatus for use within such territory. It and the manufacturer had the exclusive right to sell, and it could be therefore styled an agent, but it was not an agent upon a delcredere commission; its contracts with its customers were contracts to furnish an entire plant, and it bought like any other purchaser from the Cleveland Company upon its own credit. On October 27, 1887, the Cleveland Company declared the contract abrogated and annulled, and refused to deliver apparatus to the Brush Swan Company, or to fill its orders. To compel a specific performance of the contracts this suit .was thereafter instituted by the Brush Swan Company.
The decision as to the propriety of the defendant’s act in annulling the contract turns upon questions of fact, which relate to the extent of a modification of the conditions of the original agreement in regard to the *39 time of payment. If these conditions were substantially unmodified, they were not complied with by the Brush Swan Company, and its part of the contract was persistently left not performed, but, if they were modified so that the complainant was not required to pay for its purchase» until it collected from its own customers, it did not violate its contract, and was not guilty of any substantial breach, so far as is disclosed by the testimony. The circuit court was of opinion that the contract was modified to the extent and in the particulars which have been indicated. This is the crucial point in the case.
When the Brush Swan Company entered into its contract relations with the Cleveland Company, it did so with high expectations of commercial success from a new storage battery to be brought out by the Cleveland Company, which it was expected would be efficient both in arc and in incandescent lighting. These expectations were based upon the confidence and the prophecies of the Cleveland Company; contracts were entered into upon faith therein, but the battery was commercially a failure, and Mr. Brush turned his attention to other mechanism for incandescent lighting, which was not perfected until June 1, 1885. Meanwhile, the Brush Swan Company’s business had waned in consequence of this failure, and its debts had increased until it owed the Cleveland Company about $107,000, and about $7,600 to other creditors. Its assets were nominally about $176,000. Their real value did not appear. The two corporations, on June 15, 1885, agreed upon a settlement by which the Cleveland Company took these assets and the Brush Swan’s notes for $17,500, which were subsequently paid, discharged its own debt, and agreed to pay the other outstanding debts. This left the Brush Swan Company with a debt of $17,500 and its material of about $4,000 in value on hand, and its contracts with the Cleveland Company, which were unaltered.
In the summer and fall of 1885, friction took place between the two companies in regard to the amount of discount and the time of payment for purchases. The Brush Swan Company was in a limping financial condition, as sufficiently appears from the letter dated November 4,1885, of Col. Strong, its president. An interview between the presidents of the two companies took place on December 5, 1885, which resulted in a verbal modification of the contract. The terms of this alteration are in dispute. Mr. Spear, the bookkeeper of the Brush Swan Company, who is conceded to be an honest witness, and to whom the alleged modification was orally communicated by the two presidents, says that, as to all apparatus furnished by the Cleveland Company for the erection of new plants, it was to wait for payment until the Brush Swan’s customer had actually paid, though the customer’s term of credit might have expired. The Cleveland Company claims that the terms of payment were to be modified only in special instances, each case to be separately considered upon its merits. Mr. Spear is the only person who testifies on the subject; the deposition of the president of the Cleveland Company was taken, but he was not examined on this point. The subsequent correspondence of the parties does not sustain Mr. Spear’s recollection. For example, *40 on June 23, 1886, the Cleveland Company wrote to the Brush Swan Company as follows: “We must, therefore, ask that hereafter in each case, where you require any departure from the contract rate, either in time of payment, [75 days,] or in amount of commission, [20 and 20 ,per cent.,] that you accompany the request for it with full information and a copy of the proposition or contract. We will then advise you what we can do in the premises.” To this letter the Brush Swan Company replied on June 30th: “Your understanding, as expressed in yours of the 23d, is correct, so far as I can understand from Mr. Strong.” Again, on July 2, 1886, the Cleveland Company wrote to the complainant: “ It is absolutely necessary that we should know the terms and conditions of any sale that you make, in which you are to ask us for anything more than the regular 20 and 20 per cent, on 75 days’time. * * * Where, therefore, you do not give us the information to the contrary, we will assume that the order is made on the basis of 20 and 20 per cent, and 75 days’ time.” In view of Mr. Spear’s positive testimony, and the fact that the Cleveland Company’s president did not deny it, the question of the terms of the modification of December 5th would probably rest upon Spear’s testimony, but the result of that coiivernation is not of vital importance, for in September, 1886, another interview took place in New York between the officers of the respective companies, which resulted in an agreement which, on the part of the Cleveland Company, was stated in a letter to the Brush Swan Company, dated September 17, 1886, as follows: “You are expected to sell to purchasers at the best prices obtainable under all the circumstances, not to exceed 20 per cent, discount from our list price. When jmu do sell, however, at anything above this discount to the purchaser, you are to state on the order which you send to us for the apparatus just what discount you will need in order to enable you to make the sale, and you are also to specify on the order any terms regarding time of payment which will require a longer time to be given by us than the regular 7 5 days of your contract. * * * We will then promptly advise you whether the order is accepted by us, and there will thus be no delay whatever in filling it.” The letter says further: “We trust that you will not let these matters [debts due to the Brush Company] go by default, as, if you do, the loss will be yours, and not ours.” On October 25, 1886, the Brush Swan Company replied to this letter as follows: “The matter as expressed by you in your communication of the above date is quite satisfactory, and we will endeavor to abide by the arrangement as closely as possible.” The letters of the Cleveland Company of July 21, August 25, September 24, Octobers, and October 15, 1887, all tend to show that payment from the Brush Swan Company of the amount due upon its several orders, irrespective of the receipt by it of payment from its customers, was demanded. It was not, so far as appears frpm the correspondence which is in evidence, until October 4, 1887, that the Brush Swan Company made the point that another time or mode of payment had been agreed upon. The conclusion from the entire series of letters between the parties which commenced on September 17, 1886, is that the original con *41 tract in regard to terms of payment was not changed, except in the particular instances in which a special modification was made, and that the Brush Swan Company’s obligation to make payment upon a credit of 75 days continued, irrespective of the fact of nonpayment to it, except as modified in particular instances.
During the summer of 1887, the Cleveland Company was in a state of great irritation, in consequence of nonpayment on the part of the Brush Swan Company, from which it received from May 26, 1887, to September 15, 1887, only the sum of $1.50. It received no promise of money,' except that, in July, the general manager of the Brush Swan Company said he thought he would send $1,000 upon the existing indebtedness, which was not done. During this summer, payment of two large orders for machinery to be furnished by the Brush Swan Company to a company in Scranton and to the Erie Railroad Company was guarantied by the Brush ‘Illuminating Electric Company, which owned a large portion of stock of the complainant. In July and August interviews were had with the president and vice president and secretary of the Brush Swan Company, in which security for the payment of its orders was requested, and the absolute unwillingness of the Cleveland Company to fill orders without security or definite prospect of payment was stated, but without avail, until on September 24th the Brush Swan Company was informed by letter in a positive manner that the Cleveland Company must know that payment would be made, and must ask for security in view of the insolvency of the complainant, or it would not fill orders which had not theretofore been accepted.
The facts in regard to the financial condition of the complainant are as follows: In June, 1885, it owed $17,500. In June, 1887, it owed $56,578.26, of which $24,395.36 was due to the Cleveland Company. Its deficiency was $12,473.67. On September 1, 1887, its whole liabilities were $66,554.82, of which it owed the Cleveland Company $32,-873.94. On November 5, 1887, it owed the Cleveland Company $31,-389.92, of which $22,715.29 was for plants, payment for which had not been made to the Brush Swan Company. In this state of things, the letters of the Cleveland Company of August 13, 25, September 6, 16, 19, 24, 29, October 1, 3, 11, and 15, 1887, show its persistent attempts to induce the Brush Swan Company to make exertions in regard to payment. This urgency was met with both apparent indifference and inability to gain financial strength. It is perfectly true that unless aid from outside sources or increased capital should be furnished to the Brush Swan Company, its capacity to pay its liabilities ■depended entirely upon the amount it should receive from its own debtors, and that those payments were probably delayed from various causes beyond its control; but, on the other hand, the Cleveland Company, unless it had modified the contract, was reasonably unwilling to fill orders from an insolvent companjr, which was unable to pay its overdue debts, and without substantial hopes of ability in the future. An arbitration was called for by the Cleveland Company, in technical compliance with the conditions of the ninth article of the contract, by letters of October *42 3d, 13th, 15th, and 19th. The complainant made no reply in regard to arbitration, and on October 27th the Cleveland Company declared the contract abrogated, and thereafter refused to fill orders sent by the Brush Swan Company.
The fact that the call for an arbitration was placed by the Cleveland Company upon the refusal of the other party to furnish security is criticised by the complainant, upon the ground that the contract did not compel the complainant to give security for the performance of its undertaking. This criticism would be a just one if the conduct of the Brush Swan Company in the violation of its agreement had not been such as to fully justify the Cleveland Company in declaring the contract at an end. The correspondence shows that the Cleveland Company’s claim, that the Brush Swan Company had broken its contract respecting the terms of payment for the amount due upon its purchases, had been reiterated, and the request for security was made in the hope that a total cessation of contract relations might be avoided. Inasmuch as the Brush Swan Company is in a court of equity asking for a specific performance of a contract which it has broken, and which it cannot promise to observe in the future, it is useless to rely upon the point that the other party had made a technical slip in the reason it gave for abrogation. As the circuit court truly said, “a clearly defined failure to perform on the part of the complainant would have made proceedings under this [9th] clause wholly unnecessary, as the contracts could then have been terminated by reason of the complainant’s breach, although its financial condition at the time might have been good beyond all question.” The circuit court having found that the Brush Swan Company had committed no breach of its contract, as modified, reasonably thought that the request for an arbitration on the ground of failure to furnish security was an improper request. Inasmuch as we are of opinion that the company had broken its contract, which was not modified, and that it is therefore not in a position to ask for a specific performance by the other contracting party, the particular phraseology in which that party placed its final demand for arbitration seems unimportant.
In our view of the testimony, the complainant is asking a court of equity to compel the specific performance of a contract, which it has not kept, which it cannot truthfully assert that it will keep, and which apparently it cannot help violating, and desires to compel the defendant to furnish it with merchandise which it cannot pay for, and the ultimate payment for which it cannot attempt to secure.
The decree of the circuit court is reversed, and the bill is directed to be dismissed, with costs in the circuit court and in this court.