GENERAL ELECTRIC CO. v. WESTINGHOUSE ELECTRIC & MFG. CO.

(Circuit Court, N. D. New York. April 4, 1906.)

1. SPECIFIC PERFORMANCE—CONTRACTS—MANUFACTURE AND SALE OF SPECIFIC ARTICLES—CONTINUING CONTRACTS.

A contract to remain in force for 15 years provided that defendant should not manufacture certain electric controllers for use in the United States; that complainant would sell and deliver such controllers to defendant at specified prices; that defendant would sell them to the exclusion of all others of the same kind, and that complainant would sell defendant's overhead trolleys to the exclusion of all others; and that if complainant failed to supply defendant with controllers pursuant to contract, defendant might manufacture them. *Held*, that it was not a contract of which equity would compel specific performance.

2. INJUNCTION—MUTUALITY OF REMEDY.

There being no mutuality of remedy, complainant could not, in effect, enforce specific performance by an injunction restraining defendant from making and selling similar controllers in violation of its agreement.

3. SAME—ADEQUATE REMEDY AT LAW.

Where a contract for the manufacture and sale of electric equipment provided that in case either party violated the same, it should pay as liquidated damages and not as a penalty 50 per cent. of the price at which the appliances referred to were at the time being regularly sold to users, performance at all events was not contemplated by the parties, and complainant was not entitled to an injunction to restrain defendant's violation of the contract, on the ground that complainant had no adequate remedy at law.

4. SAME—ACCOUNTING—DISCOVERY.

Where a contract for the manufacture and sale of electrical appliances provided that in case of violation, the party guilty should pay the other as liquidated damages 50 per cent. of the price at which the appliance in question was being regularly sold at the time, an injunction restraining the violation of such contract could not be allowed for the reason that the damages were difficult of ascertainment, complainant being entitled to a discovery of sales made by defendant, in violation of the agreement in an action at law, as authorized by Rev. St. U. S. § 724 [U. S. Comp. St. 1901, p. 583].

5. COURTS—FEDERAL COURTS—PRACTICE—DEMURRER—CONCLUSIONS OF LAW.

The rule that a demurrer does not admit legal conclusions pleaded obtains in the federal courts.

6. INJUNCTION—GROUNDS—MULTIPLICITY OF SUITS.

Where a contract bound defendant not to manufacture certain electrical controllers except on complainant's failure to furnish similar controllers at certain prices and declared that in case of violation thereof, defendant should pay as liquidated damages, and not as a penalty 50 per cent. of the price at which such controllers at the time were being regularly sold to users, complainant was not entitled to an injunction to restrain a violation of such contract, in order to avoid a multiplicity of actions at law for damages.

Demurrer to bill of complaint upon the ground that the bill does not state a cause of action cognizable in equity. That is, no facts are stated which entitle the complainant to any equitable relief.

Hinsdill Parsons (Lewis Carr, of counsel), for complainant.

Guthrie, Cravath & Henderson (William D. Guthrie, of counsel), for defendant.

RAY, District Judge. The action was commenced in the Supreme Court of the state of New York and removed by defendant to this court. The bill of complaint after alleging the incorporation and residence of the parties states, in substance, that both companies, at the time of making the contract in question, were and still are engaged in the business of manufacturing and selling electrical apparatus and devices and that the General Electric Company was and now is engaged in the manufacture of series-parallel controllers of the distinguishing name "K² series-parallel controllers" and other similar controllers, and controllers involving a blow-out device, and others operating on the same general principles. There is no allegation that defendant company was or was not then engaged in making or selling any of these controllers. That March 31, 1896, the parties entered into a contract wherein it was provided, among other things, that:

"The Westinghouse Company shall not manufacture, for use in the United States, as hereinafter provided, electric brakes or the 'K² Series-Parallel Controller' or any series-parallel controller of the general type of the 'K² Series-Parallel Controller' (and other similar controllers now being manufactured by the General Company, such as controllers of the types now designated as K, L, BA, and S, respectively), or operating upon the same general principles irrespective of its form and the details of its structure or operation, or any controller involving a blow-out device. The General Company shall sell and deliver to the Westinghouse Company, with reasonable business promptness, such controllers and electric brakes, as it shall, from time to time, order, at the lowest prices at which it sells the same to others less a discount of thirty (30) per cent. in the case of controllers and twenty (20) per cent. in the case of brakes, but in no case shall such discount to the Westinghouse Company exceed one-half of the difference between such lowest price and manufacturing cost.

"The Westinghouse Company shall sell the K² Series-Parallel Controller and other series-parallel controllers of the same general type or operating upon the same general principles, and controllers involving the use of a blow-out apparatus, and electric brakes, manufactured by the General Company, to the exclusion of all other controllers of the same general type and operating upon the same general principles, and of all other electric brakes, and the General Company shall likewise sell the overhead trolleys manufactured by the Westinghouse Company, to the exclusion of all other overhead trolleys.

"In case the General Company shall refuse to furnish the Westinghouse Company with any series-parallel controllers or any electric brakes, or shall

fail to deliver the same with reasonable business promptness, or if in any instance the controllers or electric brakes offered by the General Company are not adapted to the purpose for which they are required by the Westinghouse Company, the Westinghouse Company may manufacture such series-parallel controllers or electric brakes to such extent as, and so long as, the General Company shall have refused or failed to furnish the same, or to such extent as and so long as the controllers or electric brakes offered by the General Company are not adapted to the purpose for which they are required by the Westinghouse Company.

"In case the General Company shall manufacture and sell any overhead trolleys in violation of this agreement, or the Westinghouse Company any series-parallel controllers or electric brakes in violation of this agreement, then the party so manufacturing and selling such overhead trolleys, controllers or brakes, as the case may be, shall pay to the other party, as liquidated damages and not as a penalty, fifty (50) per cent. of the price at which such overhead trolleys, controllers or brakes, as the case may be, are, at the time, being regularly sold to users by the party entitled under this agreement to the exclusive manufacture of the same.

"The provisions of this section shall apply to parts of controllers, electric brakes and overhead trolleys as well as to the complete devices.

"The General Company shall comply with the reasonable directions of the Westinghouse Company in respect to the marking (except as to the numbers of the patents under which the device is manufactured) of all controllers and electric brakes and parts thereof ordered by the Westinghouse Company.

. "All annual periods provided for in this agreement shall be computed with reference to the first day of May, 1896, and this agreement shall terminate fifteen years from the said first day of May, 1896."

That the contract is in full force and effect and that complainant company has in all respects complied with and performed the obligations and conditions of such contract, and is ready, able and willing so to do. That the defendant has violated such contract, viz.: That the Westinghouse Company has, since the date of said contract, in violation of its said covenants, manufactured, is now manufacturing and threatens to continue to manufacture, for use in the United States, large numbers of series-parallel controllers of the general type of "K² series-parallel controllers," or operating upon the same general principles, irrespective of their form and the details of their structure or operation, and large numbers of controllers involving a blow-out device, notwithstanding that it is agreed and provided in and by said contract that the General Company should have the exclusive right to manufacture such controllers for use in the United States; that the Westinghouse Company has sold, is now selling and threatens to continue to sell for use in the United States large numbers of such aforesaid controllers not manufactured by the General Company, in violation of the terms and provisions of said contract. The bill of complaint then alleges the effect of the violation of the contract as follows:

"Eighth. That the manufacture of such aforesaid controllers by the Westinghouse Company for use in the United States and the sale and continued sale by the Westinghouse Company of such aforesaid controllers not manufactured and sold to it by the General Company has caused and will cause the General Company to lose large profits which it would make by the manufacture and sale to the Westinghouse Company of the controllers so sold; that such continued sale of controllers by the Westinghouse Company injuriously affects and will continue to injuriously affect the value of the exclusive right of the General Company to manufacture and sell controllers, in such

way, and to such extent that damages thereby sustained by the General Company cannot be adequately ascertained; that the plaintiff has no knowledge of the exact number of sales of such aforesaid controllers by the Westinghouse Company not manufactured by the General Company or the dates of said sales, or what sales thereof are being made from time to time and that an accounting herein is necessary to ascertain the damages suffered by the plaintiff by reason of the sales thereof heretofore made; that the damages which the plaintiff has suffered and will suffer are incapable of measurement in an action at law; that the plaintiff has no plain, adequate or complete remedy at law in the premises, and that an injunction herein is necessary to avoid a multiplicity of actions."

The relief demanded is an injunction restraining further or future violation of the contract by defendant; an accounting concerning all manufacture and sales of such controllers in order to ascertain and determine the damages already sustained; and judgment for the amount of the damages so ascertained and found due complainant company, such other and further relief as may be proper. This is a mere naked agreement between these companies, competing in the manufacture and sale of electrical appliances generally; but not, so far as appears, in the manufacture or sale of controllers of the kinds referred to (1) that the defendant company would not manufacture for use in the United States such controllers; (2) that complainant company would sell and deliver such rollers to the defendant company with reasonable promptness at a stated reduction in price; (3) that the defendant company would sell such controllers to the exclusion of all others of the same kind; (4) that the complainant company would sell overhead trolleys made by the defendant company to the exclusion of all other overhead trolleys; (5) that if complainant company should fail to supply controllers pursuant to the contract defendant company might manufacture them; (6) that if complainant company should manufacture and sell any overhead trolleys in violation of the agreement it would pay the defendant company as liquidated damages and not as a penalty 50 per cent. of the price at which said overhead trolleys were at the time being regularly sold to users; (7) that if defendant company should manufacture and sell any of the controllers in violation of the agreement it would pay the complainant company as liquidated damages and not as a penalty 50 per cent. of the price at which such controllers were at the time being regularly sold to users. There is no allegation in the bill of complaint that either of these articles were patented, or that the exclusive right to manufacture and sell either resided in either party outside of this agreement. It is evident that each of the parties contemplated that there might be a violation of this contract by the other. The contract in express terms provides for such a contingency and fixes a rule or measure of damages. It is expressly stipulated this shall not be regarded as a penalty but as stipulated and liquidated damages for the breach of the contract.

There is no allegation or suggestion that either party, because of the contract, has abandoned any plant, or manufacture or business in which it was engaged, or has sacrificed any property, or expended any money, or put itself in any position it would not have occupied but for the agreement. The position of neither party has been changed for

the worse. There was no relation of trust, or confidence, or of dependence; no fiduciary obligation to be enforced or protected. Each was and is a free agent. If either party violates the contract the other may rescind, declare it null and void and sue for damages, or, treating it as in force, may sue for the stipulated damages. May this contract, in effect, be specifically enforced, in part at least, by enjoining a violation thereof, by restraining the defendant company from manufacturing and selling controllers of the kind described? Is there any occasion for an accounting in the equity sense of the word, or necessity for the interposition of equity to prevent a multiplicity of actions? Assuming that the contract is valid between the parties, is it of such a nature that equity will interfere to prevent a violation thereof by either party? It is clear that equity cannot compel the General Electric Company to manufacture and sell to the Westinghouse Company controllers such as are described in the complaint. It is a continuing contract, running for 15 years, and the courts will not undertake to supervise and compel performance of such a contract. 2 High on Injunctions (4th Ed.) § 1109, p. 1095. Marble Co. v. Ripley, 10 Wall. 339–358, 19 L. Ed. 955; Texas & Pac. R. Co. v. Marshall, 136 U. S. 393, 10 Sup. Ct. 846, 34 L. Ed. 385.

In Marble Co. v. Ripley, supra, the court said:

"Another serious objection to a decree for a specific performance is found in the peculiar character of the contract itself, and in the duties which it requires of the owners of the quarries. These duties are continuous. They involve skill, personal labor and cultivated judgment. It is in effect a personal contract to deliver marble of certain kinds, in blocks of a kind that the court is incapable of determining whether they accord with the contract or not. The agreement being for a perpetual supply of marble, no decree the court can make will end the controversy. If performance be decreed, the case must remain in court forever, and the court to the end of time may be called upon to determine, not only whether the prescribed quantity of marble has been delivered, but whether every block was from the right place, whether it was sound, and whether it was of suitable size or shape or proportion."

Numerous cases might be cited but it is unnecessary. Should the General Electric Company violate the agreement in the respect mentioned on its part the Westinghouse Company would be compelled to resort to an action at law for damages. If each company is relegated to its remedy at law for a violation of the agreement they stand on an equality, but if not the one has an advantage over the other. If the plaintiff company may restrain defendant company from making and selling these controllers in violation of its agreement, the defendant company ought to have a corresponding right to compel the plaintiff company to make and furnish to it controllers pursuant to the agreement. In short, there is no mutuality of remedy, and, in such cases, specific performance is not decreed.

In 2 High on Injunctions (4th Ed.) p. 1096, § 1109, the rule is thus stated:

"Upon the same principles as those which govern courts of equity in decreeing the specific enforcement of contracts generally; it has frequently been held that injunctive relief will not be granted against the violation of a contract in which the element of mutuality is wanting. Where, therefore, the obligation imposed by the contract upon the plaintiff is of such a nature that

a court could not specifically enforce it against him at the instance of the defendant, such want of mutuality affords sufficient ground for denying equitable relief to the plaintiff against a violation of the contract by the defendant."

See, also, Norris v. Fox et al. (C. C.) 45 Fed. 406; Duff v. Hopkins (D. C.) 33 Fed. 599–608.

In Strang v. Richmond P. & C. R. Co., 101 Fed., at page 517, 41 C. C. A., at page 480, the court said:

"An executory contract will not be specifically enforced unless the remedy is mutual, and the performance of a comparatively inconsiderable part of a contract does not take it out of the class of executory contracts. Unless the court can decree specific performance of the whole of a contract, it will not interfere to enforce any part of it."

Enjoining or restraining the defendant from violating the contract is but an indirect method of decreeing specific performance of the agreement in part and so far only as the defendant company has agreed not to manufacture for use in the United States controllers and to sell controllers made by complainant company only, or to the exclusion of all other controllers of the same general type and operating on the same general principles. 2 High on Injunctions (4th Ed.) p. 1116, § 1134; 1 Beach on Injunctions, p. 444, § 443, where it is said:

"An injunction to restrain a breach of a contract often operates to all intents and purposes as a decree for its specific performance."

Joy v. St. Louis, 138 U. S. 1–46, 11 Sup. Ct. 243, 34 L. Ed. 843. In that case the court said:

"The prayer for an injunction to restrain the Wabash company and its receiver from refusing to permit the Colorado company to use the right of way of the Wabash company from the north line of the park to Eighteenth street, is a prayer for all that is necessary to secure practically the specific performance of the agreement. Dinham v. Bradford, L. R. 5 Ch. 519; Tillett v. Charing Cross Bridge Co., 26 Beav. 419; Raphael v. Thames Valley Railway, L. R. 2 Eq. 37; Tscheider v. Biddle, 4 Dill. 58, Fed. Cas. No. 14,210; Biddle v. Ramsey, 52 Mo. 153; Arnot v. Alexander, 44 Mo. 27, 100 Am. Dec. 252; Hug v. Van Burkleo, 58 Mo. 202; Gregory v. Mighell, 18 Ves. 328."

In that case certain objections were urged to the decree, among others the impracticability of the court undertaking to do what was required, but the court said:

"In the present case, it is urged that the court will be called upon to determine from time to time what are reasonable regulations to be made by the Wabash company for the running of trains upon its tracks by the Colorado company. But this is no more than a court of equity is called upon to do whenever it takes charge of the running of a railroad by means of a receiver. Irrespectively of this, the decree is complete in itself and disposes of the controversy; and it is not unusual for a court of equity to take supplemental proceedings to carry out its decree and make it effective under altered circumstances. Considerations of the interests of the public are held to be controlling upon a court of equity, when a public means of transportation, such as a railroad, comes into the possession and under the dominion of the court. These considerations have been recognized and applied by this court in several cases."

Those considerations do not apply here. But it is urged in the case now before the court that there is no adequate remedy at law, and therefore equity should interfere.

There are two answers to this contention. First. The parties themselves, foreseeing that there might be a refusal to perform, have fixed the damages and a mode or basis for ascertaining or measuring them. Performance in all events was not contemplated. They have expressly provided a substitute for nonperformance. They say,

"In case the General Electric Company shall manufacture and sell any overhead trolleys in violation of this agreement, or the Westinghouse Company any series-parallel controllers or electric brakes in violation of this agreement, then the party so manufacturing and selling such overhead trolleys, controllers or brakes, as the case may be, shall pay to the other party as liquidated damages and not as a penalty fifty per cent. of the price at which such overhead trolleys, controllers or brakes, as the case may be, are, at the time, being regularly sold to users by the party entitled under this agreement to the exclusive manufacture of the same."

There is no allegation that these damages are or will be inadequate. There is no claim, allegation, or pretense, that this stipulation of the contract is void or nonenforceable. In fact and law it would not be held a penalty. Sun Printing Co. v. Moore, 183 U. S. 642–662, 22 Sup. Ct. 240, 46 L. Ed. 366; Curtis v. Van Bergh, 161 N. Y. 47, 55 N. E. 398; Wallis v. Smith, 21 Ch. Div. 243; Tode et al. v. Gross, 127 N. Y. 480, 28 N. E. 469, 13 L. R. A. 652, 24 Am. St. Rep. 475.

In the Sun Printing Company Case, supra, the court held:

"The naming of a stipulated sum to be paid for the nonperformance of a covenant is conclusive upon the parties, in the absence of fraud or mutual mistake. Parties may, in a case where the damages are of an uncertain nature, estimate and agree upon the measure of damages which may be sustained from the breach of an agreement."

In the opinion the court said:

"Whilst the courts of the United States, in actions at law, undoubtedly possess the power conferred upon the courts of common law by the statute of 8 & 9 William III, and whilst recognition of such power was embodied in the judiciary act of 1879, reproduced in section 961 of the Revised Statutes, the duty of such courts to give effect to the plainly expressed will of contracting parties is as imperatively necessary now as it was at common law after the adoption of the English statute, as will be made manifest by a reference to some of the adjudications of this court. The decisions of this court on the doctrine of liquidated damages and penalties lend no support to the contention that parties may not bona fide, in a case where the damages are of an uncertain nature, estimate and agree upon the measure of damages which may be sustained from the breach of an agreement. On the contrary, this court has consistently maintained the principle that the intention of the parties is to be arrived at by a proper construction of the agreement made between them, and that whether a particular stipulation to pay a sum of money is to be treated as a penalty, or as an agreed ascertainment of damages, is to be determined by the contract, fairly construed, it being the duty of the court always, where the damages are uncertain and have been liquidated by an agreement, to enforce the contract."

The parties to the agreement now under consideration do not denominate the sum to be paid as a penalty, or use words importing a penalty, but expressly negative any such implication or construction. The parties themselves, competent to speak, have determined the rule or measure of damages and there is no claim it is unfair or inadequate.

In Curtis v. Van Bergh, 161 N. Y., at page 52, 55 N. E., at page 400, the court held:

"These authorities show that the courts have struggled hard against the apparent intention of the parties, in order to relieve the one in default from an improvident bargain. It is, however, the law of this state, as settled by this court, that where the language used is clear and explicit to that effect, the amount is to be deemed liquidated damages when the actual damages contemplated at the time the agreement was made 'are in their nature uncertain and unascertainable with exactness, and may be dependent upon extrinsic considerations and circumstances, and the amount is not, on the face of the contract, out of all proportion to the probable loss.' Ward v. Hudson River Building Co., 125 N. Y. 230, 26 N. E. 256; Little v. Banks, 85 N. Y. 258; Kemp v. Knickerbocker Ice Co., 69 N. Y. 45, 57; Clement v. Cash, 21 N. Y. 253; Bagley v. Peddie, 5 Sandf. (N. Y) 192; Id., 16 N. Y. 469, 69 Am. Dec. 713; Dunlop v. Gregory, 10 N. Y. 241, 61 Am. Dec. 746; Cotheal v Talmage, 9 N. Y. 551, 61 Am. Dec. 716."

This case was followed in P. S. C. & M. R. C. v. Village of Peekskill, 165 N. Y. 628, 59 N. E. 1128.

Second. The damages agreed upon to be paid in case of nonperformance are easily ascertained, and this may be done as readily at law as in equity. Section 724 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 583] provides as follows:

"Sec. 724. In the trial of actions at law, the courts of the United States may, on motion and due notice thereof, require the parties to produce books or writings in their possession or power, which contain evidence pertinent to the issue, in cases and under circumstances where they might be compelled to produce the same by the ordinary rules of proceeding in chancery. If a plaintiff fails to comply with such order, the court may, on motion, give the like judgment for the defendant as in cases of nonsuit; and if a defendant fails to comply with such order, the court may, on motion, give judgment against him by default."

It is unnecessary for equity to interfere here for purposes of an accounting or a discovery. The defendants may be compelled to give evidence and produce all books of account and all papers relating to sales, prices, etc. The defendant has sold and is making and selling controllers in violation of the agreement. How many plaintiff does not state. It is not alleged even that defendant has refused to state the number. But, however, this may be in fact here, as was stated in United States v. Bitter Root Development Company et al. (No. 223, decided February 19, 1906), 26 Sup. Ct. 318, 50 L. Ed. ——, by Peckham, J., in giving the opinion of the Supreme Court of the United States:

"Under the law providing for the examination of defendants, and under section 724 of the Revised Statutes [U. S. Comp. St. 1901, p. 583] providing for the production of books and writings in actions at law, under the same circumstances that defendants might be compelled to produce them under the ordinary rules of proceeding in chancery, there is nothing in these allegations, which shows any necessity for a discovery in equity, such as would render the remedy more adequate therein than in an action at law."

And in that case, while it was for trespasses, etc., in cutting and removing timber, the court further used this language pertinent here:

"It is also argued that a court of equity has jurisdiction in such a case as this on the ground of an accounting. We do not think that this is any such case as gives a court of equity jurisdiction because of an accounting being necessary. There are no accounts between the parties. The cause of action is one arising in tort and cannot be converted into one for an account. The case made is a plain trespass, for which the defendants are liable in damages.

144 F.—30

Or it might be termed an action in trover, as stated. Whatever books, if any, defendants may have kept, showing the amount and location of the timber cut and its value, can be perfectly well obtained by an inspection of these books in an action at law. No discovery is alleged to be necessary in aid of any action at law, although the bill shows that several such actions have in fact been commenced. The facts averred do not show jurisdiction for the general purpose of discovery."

In that case the court also said:

"It is not necessary to cite many authorities for the proposition that where the main cause of action is of a legal nature, equity has no jurisdiction, provided the complainant has a full and adequate remedy at law for the wrongs complained of."

In Buzard v. Houston, 119 U. S., at page 351, 7 Sup. Ct. at page 251 (30 L. Ed. 451) Mr. Justice Gray, in giving the opinion of the court, said:

"The effect of the provision of the judiciary act, as often stated by this court, is that 'whenever a court of law is competent to take cognizance of a right, and has power to proceed to a judgment which affords a plain, adequate and complete remedy, without the aid of a court of equity, the plaintiff must proceed at law, because the defendant has a constitutional right to a trial by jury.' Hipp v. Babin, 19 How. 271, 278, 15 L. Ed. 633; Insurance Co. v. Bailey, 13 Wall, 616, 621, 30 L. Ed. 501; Grand Chute v. Winegar, 15 Wall. 373, 375, 21 L. Ed. 174; Lewis v. Cocks, 23 Wall. 466, 470, 23 L. Ed. 70; Root v. Railway Co., 105 U. S. 189, 212, 26 L. Ed. 975; Killian v. Ebbinghaus, 110 U. S. 568, 573, 4 Sup. Ct. 232, 28 L. Ed. 246. In a very recent case the court said: 'This enactment certainly means something; and if only declaratory of what was always the law, it must, at least, have been intended to emphasize the rule, and to impress it upon the attention of the courts.' New York Guaranty Co. v. Memphis Water Co., 107 U. S. 205, 214, 2 Sup. Ct. 279, 27 L. Ed. 484. Accordingly, a suit in equity to enforce a legal right can be brought only when the court can give more complete and effectual relief, in kind or in degree, on the equity side than on the common law side; as, for instance, by compelling a specific performance, or the removal of a cloud on the title to real estate; or preventing an injury for which damages are not recoverable at law, as in Watson v. Sutherland, 5 Wall. 74, 18 L. Ed. 580; or where an agreement procured by fraud is of a continuing nature, and its rescission will prevent a multiplicity of suits, as in Boyce v. Grundy, 3 Pet. 210, 215, 7 L. Ed. 655, and in Jones v. Bolles, 9 Wall. 364, 369, 19 L. Ed. 734. In cases of fraud or mistake, as under any other head of chancery jurisdiction, a court of the United States will not sustain a bill in equity to obtain only a decree for the payment of money by way of damages, when the like amount can be recovered at law in an action sounding in tort or for money had and received. Parkersburg v. Brown, 106 U. S. 487, 500, 1 Sup. Ct. 442. 27 L. Ed. 238; Ambler v. Choteau, 107 U. S. 586, 1 Sup. Ct. 556, 27 L. Ed. 322; Litchfield v. Ballou, 114 U. S. 190, 5 Sup. Ct. 820, 29 L. Ed. 132."

It is true that the bill of complaint does allege:

"That the plaintiff has no knowledge of the exact number of sales of such aforesaid controllers by the Westinghouse Company not manufactured by the General Company or the dates of said sales, or what sales are being made from time to time and that an accounting herein is necessary to ascertain the damages suffered by the plaintiff by reason of the sales thereof heretofore made."

But, as already stated, all this information may be gained, perhaps on mere request (the information has not, so far as appears, been refused), in any event as readily and correctly in an action at law as in an equitable action. Therefore, equity will not interfere for this

purpose.  So far the remedy at law is full, complete, and adequate. But the bill of complaint adds:

"That the damages which the plaintiff has suffered and will suffer are incapable of measurement in an action at law; that the plaintiff has no plain, adequate or complete remedy at law in the premises, and that an injunction herein is necessary to avoid a multiplicity of actions."

As already seen, the damages fixed and stipulated may be readily and fully ascertained and determined as to amount and recovered in an action at law, and the remedy at law is full, complete, and adequate as fixed and stipulated by the parties themselves in case of a violation of the agreement in the respects complained of.   The allegations of the bill of complaint last referred to are mere conclusions, and while on demurrer all allegations of fact are deemed admitted, mere conclusions are not.   This is settled law.   Greef v. Eq. L. A. Society, 160 N. Y. 19, 54 N. E. 712, 46 L. R. A. 288, 73 Am. St. Rep. 659; Masterson v. Townshend, 123 N. Y. 458, 25 N. E. 928, 10 L. R. A. 816; Talcott v. City of Buffalo, 125 N. Y. 280, 26 N. E. 263; Walsh v. Trustees, etc., 96 N. Y. 427; Buffalo C. Institute v. Bitter, 87 N. Y. 250.   The same rules prevail in the courts of the United States.

Does it appear from the facts stated in the bill of complaint that the relief demanded therein by way of injunction is necessary to prevent a multiplicity of actions?   The theory of the bill of complaint, in stating that "an injunction herein is necessary to avoid a multiplicity of actions," is that where a person agrees to. do certain acts from time to time, or to refrain from doing certain acts which he may do from time to time, and that each time he fails to do the act agreed to be done, or does the act he has agreed not to do, he will pay a stipulated sum as damages, and the agreement is such that a complete cause of action accrues when the breach occurs, when one violation has occurred and the party threatens to violate the contract, or refuses to perform in the future, a court of equity will intervene and restrain all threatened violations of the contract in order to prevent the possible, and even probable, necessity, for subsequent actions at law to recover the stipulated damages in case the threat is carried out.  I do not understand that equity will intervene by way of injunction for such a purpose in this class of cases.

The complainant's contention on, this branch of the case resolves itself into this; that having entered into an executory contract with defendant whereby defendant agrees to purchase of it certain controllers of its manufacture, and sell them, and those only, if it sells any, and having also expressly agreed that in case defendant violates its agreement it shall pay complainant certain liquidated damages to be ascertained in a certain way, which complainant has agreed to accept, and defendant having violated the agreement, and having threatened that it will not perform in the future, complainant is entitled to enjoin defendant from making and selling controllers of that kind, thus compelling it to sell controllers of complainant's make, if it sells any, on the ground that complainant in enforcing its stipulated remedy will be compelled, in case of successive violations, to resort to successive actions for the recovery of such damages.  This, in my

judgment, would be a perversion of the doctrine of "Bills of Peace." The contract was voluntarily entered into and complainant must have had in mind the possibility of violations by defendant company and the possible necessity of successive actions to recover the stipulated damages. It is not the case of a number of either unnecessary or vexatious suits brought against the plaintiff when the questions in controversy might be settled in one. It is not the case of repeated trespasses, or threatened trespasses, upon real estate, or the case of a large number of contracts such as bonds, or even promissory notes, held by one person and the defense is the same as to all and the purpose is to restrain a disposition of same by the holder and prevent ruinous litigation by a large number of actions. See Supervisors v. Deyoe, 77 N. Y. 219; Louisville, etc., v. Ohio, etc., Co. (C. C.) 57 Fed. 42. Nor is it the case of a large number of actions against a defendant to recover separate penalties when the trial and determination of one action will settle the right of recovery as to all. See Third Av. R. Co. v. Mayor of N. Y., 54 N. Y. 159. See generally on the subject of "Bills of Peace" and "Multiplicity of Actions," 1 High on Injunctions (4th Ed.) §§ 61, 63, etc.

In National Park Bank of N. Y. v. Goddard, 131 N. Y. 494–503, 30 N. E. 566, we find a good illustration of the proper grounds for a suit in equity to restrain a multiplicity of actions. At page 503 of 131 N. Y., at page 568 of 30 N. E., the court says:

"On this state of facts there is sufficient reason for maintaining the equitable jurisdiction. A subject-matter is presented within its adjudged and defined boundaries. A multiplicity of actions at law, involving conflicting claims to the same property, which a court of law could not solve without working injustice, founded upon one continuous and fraudulent scheme, inflicting a similar injury upon all, and different only in detail and degree, and where the legal remedy of fifty defenses to fifty replevin suits is shown to be destructive to the lien and right of the plaintiff, presents a state of facts which fully justifies the interference of equity."

It is apparent that the real ground on which complainant proceeds is a desire and purpose to enforce or compel, if possible, a specific performance of the contract by defendant company, in so far, at least, as it has agreed to sell controllers of complainant's make only. This cannot be done under the guise of preventing a number of suits the necessity for which, if it shall exist in the future, must have been and evidently was foreseen by the complainant company, and made possible by its own conduct in entering into the contract. And, in this connection, it may be remarked that all suits on the contract, in this regard, except the first, will be but a mere assessment of damages as all defenses, unless complainant shall violate the contract, will have been forever settled between these parties and their privies in the first action, whether pleaded or not.

See Guest v. City of Brooklyn, 69 N. Y. 506.

In Richmond v. Dubuque, etc., R. R., 33 Iowa, 422, 488 (see Pomeroy's Eq. Jur. § 263 note), the court said:

"We do not understand the mere fact that there exist divers causes of action, which may be the foundation of as many different suits between the parties thereto, is a ground upon which equity may be called upon to assume

jurisdiction, and settle all such matters in one suit. The case would not be different if some of the causes of action were not matured. We have never heard it claimed that equity will entertain an action upon a contract requiring the payment of money daily, monthly or yearly. Yet in such a case an action would accrue at each of such periods, and there would thus be prospectively a great multiplicity of actions. In the case before us, admitting the contract to be divisible, and that an action may be maintained upon every breach, this is no ground for interference by a court of chancery. If the contract be divisible, and the plaintiff has a right of action thereon to recover money accruing every day, equity cannot take the right from him, and substitute a remedy which will award him damages in gross for the whole amount which he may ultimately recover.".

The complainant cites and urges Brush-Swan Electric Light Co. v. Brush Electric Co. (C. C.) 41 Fed. 163. reversed in 52 Fed. 37, 2 C. C. A. 669, Fowle v. Park, 131 U. S. 88–96, 9 Sup. Ct. 658, 33 L. Ed. 67, and Diamond Match Co. v. Roeber, 106 N. Y. 473, 13 N. E. 419, 60 Am. Rep. 464, as authority for maintaining this action on the equity side of the court. In the Brush-Swan Case, supra, which was reversed, however, 52 Fed. 37, 2 C. C. A. 669, there was no provision or agreement as to damages and as complainant depended for his compensation on what he could make as profits in selling the apparatus in the territory mentioned in the agreement, and it was substantially impossible to ascertain the damages, which depended to a large extent on conjecture and speculation as to what sales complainant could or would have made, defendant was enjoined from making sales in violation of its agreement, and an accounting ordered to ascertain the damages so far as possible. Clearly there was no adequate remedy at law and the Circuit Court based its decision on that ground. Here the case is different as the parties stipulated the damages for nonperformance and same, as before stated, may be as easily ascertained in an action at law as in a suit in equity. But as that case was reversed, it cannot be regarded as an authoritative precedent. Brush-Swan E. L. Co. of N. E. v. Brush Electric Co., 52 Fed. 37, 2 C. C. A. 669.

In Fowle v. Park, 131 U. S. 88, 9 Sup. Ct. 658, 33 L. Ed. 67, the contracts related to a patent medicine, "Wistars Balsam of Wild Cherry." The patentee, Lewis Williams, had discovered, patented and owned the exclusive right to make and vend the same and the secret of its preparation in the United States; Williams for a valuable consideration sold and transferred to one Butts said preparation and the secret of its manufacture with the sole and exclusive right to manufacture and sell such medicine in certain enumerated states; Butts, for a valuable consideration, in turn, sold and transferred the same property and rights and secret to Fowle; as part of the consideration Fowle agreed that he would not sell or cause to be sold said medicine in any other territory nor there for less than a fixed price; these rights subject to this restriction passed to complainants, who have built up a large trade relying thereon. Williams also sold the same rights and secrets in said medicine and patent to certain other states and territory to Sanford and Park, subject to the same restrictions; they agreeing not to sell in the territory of Fowle. The rights of Sanford and Park passed to John D. Park, and the other defendants got their rights through him. At the time of the original sales of

territory, that part of the United States acquired from Mexico was not territory of the United States; but Williams' grant to Sanford and Park mentioned and described all territory of the United States west of Louisiana, Missouri, and Michigan. Subsequently, both Fowle and Park sold this medicine in the territory between the Rocky Mountains and the Pacific in competition. In 1869 John D. Park and Fowle entered into a contract whereby in consideration of $5,000, duly paid, Park sold to Fowle and another "all interest in and right to the sale of said medicine west of the Rocky Mountains, and also all interest in or right to the good will of selling said balsam in said territory, and in the trade-mark on the labels, bottles, wrappers, and packages containing said medicine, and in carrying on the business therein," and covenanted that his said grantees and assignees "should have and enjoy the sale and exclusive right of selling said medicine within said limits." Defendants with full knowledge of these facts violated the agreement and sold in such territory. There is no stipulation as to damages in the contracts which are absolute bills of sale containing the agreement mentioned. Complainants asked for an injunction and an accounting. It is evident that here was a case cognizable in equity; that there was no adequate remedy at law. It is evident the parties contemplated performance in any event, not damages for nonperformance. There was no right reserved to repurchase on paying damages, or by paying damages. No such understanding can be implied or justly inferred from the contract. Equally well might we say a man who purchases and pays for a farm may not restrain the cutting of his timber thereon by the vendor if he will only pay damages. The agreement was mutual in its obligations and remedies and the obligations were of such a nature that specific performance by mandatory injunction could readily be enforced by the courts. But the Supreme Court of the United States placed its decision on a broader ground, the ground that Williams having transferred property rights in the secret process of manufacturing the article he had discovered, and which was the main subject of the agreements referred to, he and his grantees could obtain relief as against breaches of trust in respect to it. The court said, page 97, of 131 U. S., and page 662, of 9 Sup. Ct. (33 L. Ed. 67):

"Relating as these contracts did to a compound involving a secret in its preparation; based as they were upon a valuable consideration, and limited as to the space within which, though unlimited as to the time for which, the restraint was to operate, we are unable to perceive how they could be regarded as so unreasonable as to justify the court in declining to enforce them. The vendors were entitled to sell to the best advantage, and in so doing to exercise the right to preclude themselves from entering into competition with those who purchased, and to prevent competition between purchasers; and the purchasers were entitled to such protection as was reasonably necessary for their benefit. Williams had and transferred property in the secret process of manufacturing the article he had discovered, and he and his grantees could claim relief as against breaches of trust in respect to it. The policy of the law is to encourage useful discoveries by securing their fruits to those who make them. If the public found the balsam efficacious, they were interested in not being deprived of its use, but by whom it was sold was unimportant."

The case differs in nearly all its aspects from the one now before the court.

In Diamond Match Company v. Roeber, supra, defendant sold his factory, stock, fixtures, trade, trade-mark, and the good will of his business to a corporation engaged in the same business and in part consideration covenanted he would not for 99 years engage in the same business, except in the employ of the purchasing company, within the United States except only Nevada and Montana. He gave a bond in the penal sum of $15,000, conditioned to pay that sum in case he violated the agreement. There was no stipulation as to damages in the contract itself. Having bought the business and good will and trade-mark as well as all the property real and personal connected therewith, accompanied by this agreement, which was a part of the purchase, and paid the full consideration; and as it was evident it was intended the agreement should be performed in all events, and as the bond was in the nature of security for damages sustained, and the agreement or contract had been fully performed by plaintiffs, and it was just and practicable to enjoin the defendant and unjust to refuse such injunction, the court held the case was cognizable in equity unless it was apparent that payment of damages in lieu of performance was intended. The court held this was a question of intent, and that the mere giving of a bond did not show an intent of the parties that payment of damages should take the place of performance. The case is dissimilar in nearly all respects to the one before the court. It is well settled that when the one party to a contract has fully or even partly performed it and he is ready and willing to complete performance, the other party may be compelled to perform if the acts to be done are such as the court will undertake to supervise in enforcing its decree. Whitney v. Hay, 181 U. S. 77, 21 Sup. Ct. 537, 45 L. Ed. 758.

So where it has been fully performed by the one party and is no longer executory on his part and the acts to be done are such that compliance may be enforced by the court. But in the case now being considered the court cannot decree specific performance of the entire contract. Complainant company has performed up to date but it may not perform in the future either by supplying controllers or in selling overhead trolleys manufactured by the defendant company. After one suit for damages, if complainant company shall succeed, defendant company may conclude to fully perform.

For the reasons stated the bill of complaint fails to state facts showing a cause of action cognizable in equity.

The demurrer is sustained, but complainant may amend, as it may be advised, within 30 days after being served with a copy of the order to be entered in accordance herewith.