GENERAL ELECTRIC CO. v. WESTINGHOUSE ELECTRIC CO.

(Circuit Court, N. D. New York. March 2, 1907.)

INJUNCTION—SUBJECTS OF PROTECTION—RESTRAINING BREACH OF CONTRACT.

Plaintiff and defendant, each extensively engaged in the manufacture and sale of electrical apparatus and supplies, and each owning or controlling a large number of patents covering such apparatus, entered into a general contract, to continue for a term of years, by which each released the other from all claims for damages for past infringements and licensed the other to use its patents, except that defendant agreed to purchase all the electric controllers and brakes used or sold by it from plaintiff, which owned the patents therefor, and not to manufacture the same or others of the same type for itself except in case plaintiff failed to supply it with the same as plaintiff agreed to do, and plaintiff similarly agreed to purchase overhead trolleys exclusively from defendant. The contract contained a large number of other provisions intended to prevent conflicts and disputes between the parties, and, among other things, provided for liquidated damages recoverable should either party manufacture the articles named in violation of its terms. *Held,* that where plaintiff, in reliance on the contract, had abandoned the manufacture of trolleys, had incurred large expense in preparing for the manufacture of controllers and brakes to supply defendant, and had during all of the expired part of the term fully performed the contract on its part and was able and willing to continue to do so, it was entitled to maintain a suit in equity to enforce the negative covenant of defendant not to manufacture controllers by enjoining such manufacture, notwithstanding the fact that defendant could not enforce specific performance of plaintiff's agreement to manufacture and supply it with such controllers and there were many other provisions of the contract not specifically enforceable; that the provision of the contract for liquidated damages was not intended as a substitute for performance, nor did it afford plaintiff an adequate remedy at law for all of the results of the breach, which included infringement of plaintiff's patents, competition in business, and other incidental damages not readily ascertainable by defeating the general purpose and objects of the contract as an entirety.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, §§ 111–113.]

In Equity. Demurrer to amended bill of complaint on grounds, first, that complainant has a full, complete, and adequate remedy at law, and, second, that complainant's alleged cause of action is not cognizable in equity.

Hinsdill Parsons (Lewis E. Carr, John G. Milburn, and Charles Neave, of counsel), for complainant.

Guthrie, Cravath & Henderson (J. C. McReynolds, of counsel), for defendant.

RAY, District Judge. The decision of this court on the argument of the demurrer to the original bill of complaint herein is found in 144 Fed. 458. The question is whether or not complainant has now stated facts which, admitted to be true, entitle him to relief in equity. The facts alleged may be summarized as follows:

(1) Complainant, or General Company, is a New York corporation; defendant, or Westinghouse, is a Pennsylvania corporation.

(2) About March 31, 1896, said corporations entered into a written contract, by its terms to continue and be in force for 15 years, and which has not been rescinded or abrogated, wherein, in accordance with the facts, it was recited:

"Whereas, each of the parties hereto owns or controls a large number of patents and patent rights, and is willing to grant to the other party a license thereunder, upon such other party agreeing to observe the regulations and conditions as to the use of such license hereinafter provided; and

"Whereas, it is to the advantage of the parties hereto that they should co-operate in the manner hereinafter provided, in supporting the patents and patent rights which they severally control or may hereafter acquire."

(3) Prior to and at the time of entering into said contract each of said companies was, and ever since has been, engaged in the business of manufacturing and selling electrical apparatus and devices.

(4) Prior to the making of such contract the General Company was making and selling, among other electrical apparatus, "series-parallel controllers," distinguished as "K2 series-parallel controllers," and other similar controllers containing a blow-out device, and ever since the making of such contract has been and now is manufacturing and selling such controllers, and also others operating on the same general principles.

(5) Such controllers have been and are so made and sold under patents owned or controlled by the General Company, and other patents for improvements on said patented inventions acquired since such contract was made.

(6) The recitals of the contract, quoted, referred (among others) to the patents above described.

(7) By such agreement each party granted to the other (subject to all outstanding licenses) a license to manufacture, use, and sell under all United States patents, except such as were expressly excepted by the terms of the agreement, which it owned or controlled, or with respect to which it had or might thereafter obtain a right to grant a license.

(8) By such agreement the Westinghouse Company is not to manufacture for use in the United States, except as hereafter stated, electric brakes or controllers of the kind or description above referred to, or any controller involving a blow-out device.

(9) By such agreement the General Company, complainant, is to sell and deliver to the Westinghouse Company, defendant, such elec-

tric brakes and controllers as it shall from time to time order at the same prices it sells same to others, less a limited and specified discount.

(10) By such agreement the General Company is not, except as specially provided, to manufacture overhead trolleys of any type (patents for overhead trolleys being owned or controlled by the Westinghouse Company).

(11) By such agreement the Westinghouse Company is to sell and deliver to the General Company such overhead trolleys as it may order at the lowest price it sells same to others, less a limited and specified discount.

(12) By such agreement the Westinghouse Company is to sell the said "K2 series-parallel controller" and other series-parallel controllers of the same general type, or operating upon the same general principles, and controllers involving the use of a blow-out apparatus, and electric brakes manufactured by the General Company, to the exclusion of all other controllers of the same general type and operating upon the same principles, and of all other electric brakes.

(13) By such agreement the General Company is to sell the overhead trolleys manufactured by the Westinghouse Company, to the exclusion of all other overhead trolleys.

(14) The agreement then provides (A) that, in case the Westinghouse Company neglects or fails to comply with its said agreement as to furnishing the overhead trolleys, then the General Company may itself manufacture same during the continuance of such failure; and (B) that in case the General Company neglects or fails to comply with its said agreement as to furnishing controllers or electric brakes, then the Westinghouse Company may manufacture same during the continuance of such failure.

(15) The agreement provides for a "Board of Patent Control," and also provides that in case the question arises whether either party has violated its agreement by refusing, etc., to supply or furnish the other with the devices mentioned and which it has agreed to supply, the decision of such board on such question is to be final and binding on the parties.

(16) It was also agreed in such contract that each party would comply with the reasonable directions of the other as to marking the goods or devices ordered; that the Westinghouse Company would keep on hand a sufficient stock of such devices, including repair parts; that the General Company might sell all overhead trolleys it had in stock or in process of manufacture when the agreement was made, and that the Westinghouse Company might sell all controllers it had in stock or in process of manufacture at that time. The term "overhead trolley" was also defined. The controllers on hand and in process of manufacture by the Westinghouse Company when the agreement was made were covered by the patents of the General Company.

(17) The bill of complaint alleges, and it is admitted by the demurrer, that the complainant, General Company, "has expended large sums of money in a manufacturing plant and facilities with which to supply the reasonable requirements of the Westinghouse .Company, defendant, with respect to said controllers," and, in substance,

that in all respects it has complied with and kept and performed its said agreement, and is able, ready, and willing so to do in the future; also, that it has expended large sums of money in developing and improving controllers which, within the intent and meaning of such contract, the defendant company was to purchase exclusively from it, the complainant company, all of which it has done, to meet the demand with respect to such controllers resulting from the development of the art of electric railroading.

(18) The bill of complaint also alleges:

"Eighth. That the controllers so manufactured by the General Company, which it was in and by said contract to have the sole and exclusive right to manufacture and sell in the United States, were and are those covered and protected by patents, issued by the Government of the United States, hereinbefore referred to as owned and controlled by the General Company; that the manufacture of such controllers or devices operating upon the same general principles by the Westinghouse Company is not only an invasion of the rights of the General Company under its patents, but is also a violation of the covenants and agreements on the part of the Westinghouse Company in said contract contained; that in and by said contract the respective parties thereto were granted and obtained licenses to use other patents than those relating to controllers; that the reservation to the General Company of the exclusive right to manufacture and sell controllers, as the same was reserved and provided for therein, was one of the inducements for the General Company to enter into said contract and grant to the Westinghouse Company the license it did to use and have the benefit of the other patents owned and controlled by it which were included in said agreement; and that, through the violation by the Westinghouse Company of that part of the said contract relating to the manufacture and sale of controllers, a part of the consideration for the agreements of the General Company therein contained will fail, unless the Westinghouse Company be enjoined and restrained from a continuation of such violation thereof."

(19) The bill of complaint alleges a violation of the said agreement by the defendant company in the following language, viz.:

"Sixth. That the Westinghouse Company has since the execution of said contract, in violation of its covenants therein, manufactured and is now manufacturing, and threatens and asserts a right to continue to manufacture, for use in the United States, large numbers of controllers of the general type of 'K2 series-parallel controllers,' or operating upon the same general principles, irrespective of their form and the details of their structure or operation, and large numbers of controllers involving a blow-out device, notwithstanding it was covenanted and provided in and by said contract that the General Company should have the exclusive right to manufacture such controllers for use in the United States, and notwithstanding the fact that the General Company is now and has been at all times since said contract was entered into the owner or in control of the patents covering such devices with which ownership and control it has not parted since said contract was entered into; that the Westinghouse Company has sold, is now selling, and threatens and asserts a right to continue to sell for use in the United States large numbers of controllers not manufactured by the General Company under its patents; and that such acts and conduct on the part of the Westinghouse Company are in violation of the terms and provisions of said contract."

(20) The bill of complaint alleges the effect upon and damage to it, as follows:

"Ninth. That the manufacture for use in the United States and the sale by the Westinghouse Company of such controllers not manufactured and sold to it by the General Company has caused and will cause the General Company to lose large profits which it would make by the manufacture and sale to the Westinghouse Company of the controllers so sold by that company;

that such continued sale of controllers by the Westinghouse Company not obtained by it from the General Company under and pursuant to the provisions of said contract injuriously affects and will continue to injuriously affect the value of the exclusive right of the General Company to manufacture and sell controllers in such way and to such extent that damages thereby sustained by the General Company cannot be adequately ascertained; that the plaintiff has no knowledge of the exact number of sales of such controllers by the Westinghouse Company which were not manufactured by or obtained from the General Company, or the dates of such sales, or what sales thereof are being from time to time made; that an accounting herein is necessary to ascertain the times, quantities, and extent of such sales and the damages suffered by the plaintiff by reason of the sales thereof heretofore made, and the amount due and payable on account thereof by the defendant to the plaintiff; that the damages which the plaintiff has suffered and will suffer are incapable of measurement in an action at law, for the reason that the provision in said contract with reference to the exclusive sale and manufacture of the controllers by the General Company was part of the entire contract, each of the provisions of which were material to the other provisions therein contained: and that the plaintiff has no plain, adequate, or complete remedy at law in the premises because of the matters hereinbefore stated, and an injunction herein is necessary to avoid a multiplicity of actions and to prevent irreparable damage to the business of the plaintiff herein, resulting from the continued violation of the contract by the defendant herein."

Judgment is demanded as follows:

"Wherefore the plaintiff prays judgment that the defendant, Westinghouse Electric & Manufacturing Company, its officers, agents, and employés, and each and all of them, be enjoined and restrained from manufacturing for use in the United States any controllers of the general type of 'K2 Series-Parallel Controllers,' or operating upon the same general principles of their form and the details of their structure or operation, or any controllers involving a blowout device, and from selling and delivering for use in the United States any of such aforesaid controllers not manufactured by the General Electric Company; that the said defendant be enjoined as aforesaid during the pendency of this action; that the defendant account to the plaintiff concerning all manufacture and sales of all such aforesaid controllers for use in the United States not manufactured by the plaintiff, in order that the damages of the plaintiff may be ascertained and determined; that the plaintiff have judgment against the defendant for the amount found to be due to the plaintiff upon said accounting; and that plaintiff have such other and further or different relief as in equity and good conscience may seem just, together with the costs of this action."

(21) The agreement itself contains a remedial provision, in case of a violation thereof in the respects complained of, which is set forth in the bill of complaint and is as follows:

"In case the General Company shall manufacture and sell any overhead trolleys in violation of this agreement, or the Westinghouse Company any series-parallel controllers or electric brakes in violation of this agreement, then the party so manufacturing and selling such overhead trolleys, controllers or brakes, as the case may be, shall pay to the other party, as liquidated damages and not as a penalty, fifty (50) per cent. of the price at which such overhead trolleys, controllers, or brakes, as the case may be, are, at the time, being regularly sold to users by the party entitled under this agreement to the exclusive manufacture of the same.

"The provisions of this section shall apply to parts of controllers, electric brakes and overhead trolleys, as well as to the complete devices."

The contract, which is annexed to the bill of complaint, contains many other mutual agreements, and in some cases specifies the result of a violation or provides a remedy therefor.

The agreement as a whole, an entirety, has far broader and more

comprehensive objects and purposes than the ones indicated by the statements of the bill of complaint itself (not reading the entire agreement), and the agreement alleged and claimed to have been violated by the defendant company is but one of many contained therein.

In addition to the recitals already quoted, we find the following:

"Whereas, it is to the advantage of both parties hereto that no licenses under any of the patents of either should be granted to others than the parties hereto, except in conformity with the system for granting such licenses hereinafter provided; and

\* \* \* \* \* \* \* \* \* \*

"Whereas, the variety of devices manufactured by each party and the number of patents controlled by each party are so great, that the only just and equitable method of determining the amounts to be paid by each party, as compensation for the use of the patents and patent rights of the other, and to defray the expenses of supporting said patents and patent rights, is with reference to the aggregate amount of business to be done by the parties respectively under the protection of said patents and patent rights, subject, however, to a proper adjustment with reference to the relative values of the patents and patent rights controlled by said parties respectively and under which they respectively license each other; and

"Whereas, it is agreed that the relative aggregate values of said patents and patent rights controlled by the parties hereto respectively (so far as the same are covered by this agreement) are in the proportion of sixty-two and one-half (62½) for those controlled by the General Company and thirty seven and one-half (37½) for those controlled by the Westinghouse Company; 

"Now, in consideration of the premises, the licenses hereinafter granted and the mutual covenants herein contained, the parties hereto have for themselves and their successors covenanted and agreed as follows:"

It is evident on a reading of the entire contract that the parties, being engaged in the same general business, the manufacture and sale of electrical apparatus and supplies, including those named, and having interests which conflicted and brought them into competition in the general trade, and being respectively the owners of certain patents, or in control of certain patents, under which each was manufacturing and selling electrical apparatus, and having disputes as to such patents and alleged infringements thereof by each other, and being desirous, in a sense and to an extent, of consolidating their business so as to avoid such competition and disputes, and at the same time protect their patent interests and extend their trade in patented devices and other electrical devices, and also being desirous of building up and extending their trade and business and obtaining control of other patents and inventions for such devices, entered into this contract, and, among other things, provided for the exclusive manufacture by the one of controllers of a certain type and of electric brakes, and by the other of overhead trolleys. To this end they excepted from their general mutual license for the manufacture, use, and sale of electrical apparatus the patents relating to or covering the devices named. As to these, whether they owned, respectively, conflicting patents or not, they mutually covenanted and agreed, to save disputes and injury to business, that they would not manufacture and sell in conflict with each other, but that each would confine itself, in manufacture, to a particular line of devices, supplying the other promptly for its trade, and relying upon such agreement, which is not void as in restraint of trade (Kinsman and another v.

Parkhurst, 18 How. [U. S.] 289, 15 L. Ed. 385), for protection.
The complainant company, relying on the contract, has not only been
to large expense and put itself in a different position to its detriment,
but has in good faith and in all respects performed the agreement.
It purchases overhead trolleys from defendant company, and has
given to it a monopoly of the manufacture free from competition with
complainant company. The consideration for this agreement of the
Westinghouse Company does not rest solely in the agreement of
the General Company to make and supply controllers, but on many
other considerations and covenants. It was necessary for the General Company to enlarge its plant at great expense; to expend money in improvements, in inventions, and in controlling patents to keep
pace with the advancing art; to protect its patents, and the defendant company as well in their use; to abandon the manufacture or sale
of overhead trolleys of any description other than those made by defendant company; and to surrender claims for past infringements
by defendant company of its patents and rights, which last by subdivision 6 of the agreement, it irrevocably did. All these things it has
done, and it is impossible to restore complainant company to its
former position.

But the defendant company contends that the parties to the agreement did not contemplate that this provision of the agreement should be
performed in any event, and that it is not an essential element or part
of the agreement in its entire scope and purpose. It contends that it
might have been omitted without detracting from or destroying the
essential purpose of the agreement, which is operative without it
and whether this clause is performed or not. It contends that the
parties contemplated and provided for, and in a sense assented to,
the nonperformance of this clause of the agreement when they inserted a special provision providing a rule or measure of damage or
a compensation for a breach thereof. It is contended that, foreseeing either party might see fit to disregard and violate these particular
clauses, by making and selling controllers and brakes in the one case,
by making and selling overhead trolleys in the other, they substituted
the payment of a sum of money, to be ascertained in the mode and
on the basis mentioned and described, for nonperformance in the
regards mentioned, and that this payment is, by agreement of the
parties, the full measure of damages, and affords full, adequate,
and complete remedy, and that, as the amount to be paid is easily
ascertained in an action at law, there is full, complete, and adequate
remedy at law, and that equity will not entertain jurisdiction or undertake to compel performance. It is also contended there is no mutuality of remedy in this regard, and therefore equity, not being able to
compel the complainant company to make and sell controllers and
brakes to the defendant company, will not undertake to compel that
company to purchase its controllers and electric brakes of complainant by enjoining it from making and selling those of its own manufacture. So equity would not undertake to compel the defendant
company to make and sell overhead trolleys to complainant. However, the agreement provides that, in case either company fails to

make and supply the other with the appliances it has agreed to make and supply, that company, so long as such failure to make and supply continues, may manufacture and supply itself. And this provision would justify either party in making and selling the appliances covered by the patents owned or controlled by the other, even though these patents are not included in but excepted from the license provisions of the agreement. Hence the want of mutuality in this regard is not very material, except that to supply itself each company would be compelled to add to its plant and incur expense and employ labor skilled in that business, which it might find difficulty in doing. Defendant's agreement is that it shall not manufacture for sale in the United States controllers or electric brakes of certain types, and that it will sell such devices of those descriptions manufactured by the complainant company to the exclusion of all others, and that it will make and sell to complainant other electrical devices—overhead trolleys. The complainant's agreement is that it shall not manufacture overhead trolleys of any type, and that it will sell such overhead trolleys manufactured by defendant company to the exclusion of all others, and sell to it the controllers and brakes mentioned. Neither party agrees to take, or order, or sell any number of such devices. Either may, so far as is stated in the agreement, neglect to deal in such devices. In case either party makes and sells any of the devices it has agreed not to manufacture, it is to pay to the other party the stipulated damages. If either party neglects or refuses to supply the other, that other may manufacture and supply itself.

Now what remedy has the defendant company against the complainant company in case the court decrees performance, or enforces by injunction this negative agreement, the agreement not to manufacture and sell controllers and electric brakes except such as are made by complainant company, and that company on its part neglects or refuses to supply it with such devices? It may sue for damages, in which case its recovery, if any, is confined to a money judgment. It may also erect a plant and manufacture the devices and thus supply itself. But this last remedy is not against the complainant company, or one the court can enforce. Clearly the court cannot compel complainant company to perform personal service in manufacturing and selling controllers and electric brakes to defendant company. Hence there is no mutuality of equitable remedy. Complainant company has not fully performed the contract, as it has years to run, and it may not perform hereafter. It has performed up to date. Hence this is not a case where want of mutuality of remedy is cured by full performance on the part of the complainant. Nor is it a case where from the date of filing the bill there is mutuality of remedy, as in the case of enforcing an agreement signed by one party only to sell land for a fixed price. The complainant company seeks to enforce the performance by defendant of its part of a mutual executory agreement in regard to specific devices in a case where it, complainant, cannot be compelled to perform its part of the same executory agreement; in a case where the only remedy of the defendant against the complainant for its breach of that agreement in that regard is an action for money compensation.

In 6 Pomeroy's Equity Jurisprudence and Equitable Remedies (volume 2, Eq. Remedies) § 769, pages 1291, 1292, it is said:

"The frequent statement of the rule of mutuality, 'that the contract to be specifically enforced must as a general rule be mutual—that is to say, such that it might at the time it was entered into have been enforced by either of the parties against the other," is open to so many exceptions that it is of little value as a rule. But in view of the firm place that the doctrine of mutuality has obtained in the courts of equity, it seems well to attempt a restatement that shall be more free from exceptions. The following form seems to meet the cases generally. If, at the time of the filing of the bill in equity, the contract being yet executory on both sides, the defendant, himself free from fraud or other personal bar, could not have the remedy of specific performance against the plaintiff, then the contract is so lacking in mutuality that equity will not compel the defendant to perform, but will leave the plaintiff to his remedy at law. This rule, it is believed, covers the circumstances in equity where, according to the weight of authority, the court refuses its aid for lack of mutuality.

"So far as there is a principle of mutuality, it is a mutuality of remedy in equity at the time of filing the bill that is required, and not a mutuality in the terms of the contract when the contract is made."

In 3 Col. Law Rev. 1, Professor James Barr Ames, speaking on this subject, suggests the following as the rule:

"Equity will not compel specific performance by a defendant if, after per-. formance, the common-law remedy of damages would be his sole security for the plaintiff's side of the contract."

There is a class of cases where a defendant may be enjoined from violating the negative part of an agreement when neither defendant nor the plaintiff can have specific performance of the affirmative side or part of the same agreement. The answer of equity in such cases to the want of mutuality in remedy is a conditional decree for performance, or enjoining a violation of the covenant—one good so long as plaintiff performs, and self-dissolving upon his failure to perform. Philadelphia Ball Club v. La Joie, 202 Pa. 210, 90 Am. St. Rep. 627, 51 Atl. 973, 58 L. R. A. 227; Lumley v. Wagner, 1 De Gex, M. & G. 604; 6 Pomeroy's Eq. Jur. & Eq. Remedies (2 Eq. Rem.) § 775, p. 1299; McCaull v. Braham (C. C.) 16 Fed. 37. See, also, Arena Athletic Club v. McPartland, 41 App. Div. 352, 58 N. Y. Supp. 477, and Metropolitan Exhibition Club v. Ewing (C. C.) 42 Fed. 198, 7 L. R. A. 381. But these cases relate to personal contracts involving special personal attainments and skill. Lumley v. Wagner, supra, was the case of a singer; Philadelphia Ball Club v. La Joie, supra, was the case of a baseball player; McCaull v. Braham, supra, was the case of a distinguished theatrical artist; Arena Athletic Club v. McPartland, supra, was the case of a professional boxer; and Metropolitan Exhibition Co. v. Ewing, supra, was the case of a baseball player.

But in Hills v. Croll, 2 Phil. Ch. 60, we have a case quite in point. True, the authority of the case is questioned in Catt v. Tourle, 4 Ch. App. 654, 660, but it is also commented on in Lumley v. Wagner, supra, and there approved. For a full statement of Hills v. Croll, see 1 De Gex, M. & G. (edited by J. C. Perkins, Little, Brown & Co., 1871) 626. In that case Croll had obtained two patents for purifying gas, and the result of his process was the production of muriate of ammonia and sulphate of ammonia. He entered into a contract with

Hills by the terms of which (1) Croll was to purchase all acids used by him in his patented process from Hills and from no other person; (2) Hills on his part agreed to supply same; (3) Hills was to have the right to purchase all the ammonia produced by the processes at certain prices as to each; (4) it was also agreed that all licensees of the patented process should be bound by the license to purchase their acids of Hills, who was to supply same, and give him the same option to purchase the ammonia; (5) Hills might at his option furnish muriatic acid or sulphuric acid. This agreement was acted on for some time, when defendant refused to abide further. Hills sued in equity to enjoin Croll from purchasing his acids of others, thus seeking to compel Croll to purchase of him in accordance with his agreement, and also to enjoin him from granting licenses except in accordance with the agreement. The Lord Chancellor, Lord Lyndhurst, denied the injunction, and placed his decision on the grounds that there was no mutuality of equitable remedy, saying:

"Has the court any power to compel Hills to fulfill his part of the agreement? Can the court order him to continue the manufacture of acids, or to purchase them elsewhere, for the purpose of supplying the defendant? It is clear, I apprehend, that the court has no such power. In the case of Colman v. Morris, Mr. Colman was restrained from writing for any other theatre, the court inferring that that would compel him, or have a tendency to compel him, to write for the Haymarket Theatre. But in this case the court has no power to compel the plaintiff to supply the defendant with acids by ordering him not to supply any other person; that is not the agreement, nor was it ever intended that it should be the agreement: therefore it is clear that the court cannot either directly or indirectly compel him to perform his part of the agreement. And it has been laid down again and again, and very recently in a case before Sir Edward Sugden in Ireland, that unless the court can decree specific performance of the whole of a contract it will not interfere to enforce any part of it."

In a note on this case by E. Fitch Smith we find the following observation, commenting on and comparing Hills v. Croll and Dietrichsen v. Cabburn, 2 Phil. Ch. 51:

"But even supposing that the obligation of the contract was reciprocal, the court appears to have overlooked the distinction between contracts which remain wholly executory, and those which have been executed or acted on to such an extent as to give to one of the parties an equity, arising from part performance of the contract, to insist upon an adherence to its terms by the other.

"So long as a contract, which is not mutual in point of remedy, rests merely in covenant, the maxim that the court will not enforce a part of an agreement where it cannot compel performance of the whole—in other words, will not give one-sided relief—is undoubtedly true, and applies, it is conceived, as much to the jurisdiction by way of injunction as to that by specific performance; for where the court does interpose by injunction to restrain the violation of a negative term in a contract, it is, in many cases, avowedly done with a view of thereby inducing the defendant to perform some other term which the court has no direct means of enforcing. But it seems perfectly consistent with this that, when such a contract has been executed or acted upon so far as to have altered the relation between the parties, and to have given to one of them an equity arising out of those dealings, as distinquished from his original right under the contract itself, the court will, notwithstanding the original nonmutuality of the contract, give effect to that equity, either directly by a decree for specific performance, or partially and indirectly by an injunction, according as the nature of the case may admit of the more or less complete measure of relief."

151 F.—43

In Catt v. Tourle, supra, the plaintiff, who was a brewer, sold some land to the trustees of a freehold society, who covenanted with him that he, his heir and assigns, should have the exclusive right of supplying beer to any public house erected on the lands, but the plaintiff did not execute any covenant to supply such beer. He was, however, ready, able, and willing to supply beer at a fair price, and offered so to do. Defendant, a member of the society, also a brewer, acquired title to a part of the land, and erected thereon a public house which he supplied with beer of his own manufacture. Defendant was enjoined from supplying beer to his own public house. I do not regard that case in point here or as in conflict with Hills v. Croll.

In the case now before the court it is quite clear (1) that the complainant company has fully performed the agreement on its part up to this time, and is able and willing to perform in the future, and has been to large expense in preparing itself to perform the agreement; (2) that in reliance upon the mutual agreements of the contract, including the ones in question, and in the expectation that they would be performed by the defendant, complainant has not only expended money to enable it to fulfill, but has irrevocably surrendered valuable claims for damages for past infringement by defendant of its patent rights, and granted licenses to the defendant to manufacture certain devices thereunder, of which defendant is now availing itself in violation of its agreement, considered as a whole; (3) that complainant, to an extent at least, and relying on the agreement, has disabled itself from successfully competing with defendant in the manufacture of overhead trolleys, having by its agreement abandoned entering into that branch of manufacture entirely; (4) that the defendant company is not only violating its contract obligations to the complainant company, but in so doing is infringing the patent rights of that company, and so precipitating not only actions for damages, one or more, but actions at law, or in equity, or both, for such infringements; (5) that the complainant company cannot be restored to its former position, as it has partly performed, and cannot be fully and adequately compensated in damages unless it shall be held that the amount stipulated in the agreement and recoverable at law is full and adequate compensation, within the contemplation and stipulation of the parties and made so by them, for all damages of every nature sustained by complainant, those growing out of the conditions, transactions, grants, and surrenders recited, as well as those arising from a breach of the agreement not to manufacture for use in the United States controllers and electric brakes of the types mentioned, and not to sell controllers or brakes of those types except those manufactured by complainant.

If complainant company shall fail in the future to comply with this executory agreement by refusing to manufacture and furnish controllers and brakes, defendant company may do rightfully what it is now wrongfully doing—make them itself. This remedy was given by the agreement of the parties as part of the contract. The exact correlative agreement of the defendant company to manufacture and furnish complainant with overhead trolleys provides as a remedy, in case of default, that the complainant company may make them itself. Each party is thus, in these regards, provided with a remedy for such a default by

the terms of the agreement itself. But the result is or may be an entire abrogation of the agreement so far as these provisions are concerned, or as to one of them, at the will of the party electing not to manufacture. There is an implied agreement on the part of each to make and supply the devices it agrees to sell to the other, however, and for a violation of that implied agreement no damages are agreed upon or stipulated. If either makes and sells the devices it has agreed not to make, except in the contingency mentioned, in violation of the agreement, then the provision as to stipulated damages, if it be that and not a penalty, comes into play. The agreements of the defendant company, that it will not manufacture for sale in the United States electric brakes and controllers of the types mentioned, and that it will sell such brakes and controllers manufactured by the complainant company to the exclusion of all others, are both negative covenants, and include an agreement not to manufacture a patented device or patented devices. In 22 Cyc. 846, it is stated:

"A contract affirmative in form often involves a negative in substance, and in such case the court will import the negative quality and enjoin acts in breach of the contract, in cases where an injunction is otherwise proper. The test is not in the form of the language used, but in the quality of the acts required." Dwight v. Hamilton, 113 Mass. 175.

So these are covenants separable from the other parts of the main agreement between the parties, except as to consideration, in so far as the parties agree to do or not to do certain things and grant privileges. And these covenants grant special and exclusive privileges; as, for instance, the complainant company is granted the exclusive privilege of manufacturing electric brakes and controllers of certain types, and the defendant company is granted the exclusive privilege of manufacturing overhead trolleys. In such cases a breach of the covenant is often enjoined when the remedy at law is not full, complete, and adequate. 22 Cyc. 847, and cases there cited. And the remedy by injunction to prevent the breach of a contract is often obtainable although the remedy of specific performance is not. 22 Cyc. 845, and cases cited. When a contract contains both affirmative and negative covenants, breach of the latter, or negative, covenants may be enjoined although specific performance of the former cannot be decreed. Standard Fashion Co. v. Siegel-Cooper Co., 30 App. Div. 564, 52 N. Y. Supp. 433, affirmed 157 N. Y. 60, 51 N. E. 408, 43 L. R. A. 854, 68 Am. St. Rep. 749; Singer Sewing Machine Co. v. Union B. N. Co., 1 Holmes, 253, Fed. Cas. No. 12,904; Samuel Cupples E. Co. v. Lackner, 99 App. Div. 231, 235, 90 N. Y. Supp. 954; 22 Cyc. 845, where it is said, among other things in point, "A contract will not be specifically enforced in part only, but the breach of a part of a contract will in many instances be enjoined."

And so, while this agreement contains many and various provisions relating to the dealings between the parties which a court of equity would not undertake to specifically enforce, still in view of the equity which complainant has gained, by reason of its performance and expenditures, to have performance by defendant, the court may grant injunctive relief and prevent a breach of this negative covenant. Standard Fashion Co. v. Siegel-Cooper Co., 157 N. Y. 60, 51 N. E. 408, 43 L. R. A. 854, 68 Am. St. Rep. 749; Samuel Cupples Co. v. Lack-

ner, 99 App. Div. 231, 90 N. Y. Supp. 954. In Standard Fashion Co. v. Siegel-Cooper Co., supra, the court held:

"Where a complaint stating a cause of action for specific performance of a contract for business dealings between the plaintiff and 'the principal defendant, calling for varied and continuous acts, also seeks an injunction to restrain the breach of a negative and severable covenant through the transaction of the business by the principal defendant with a competitor of the plaintiff, joined as a defendant and alleged to be knowingly promoting the breach, the case may properly be retained by the court as one permitting the exercise of the discretionary power of injunction, although specific performance of the affirmative provisions of the contract would probably be impracticable through the difficulty of its enforcement."

And in Cupples E. Co. v. Lackner, supra, the court said:

"It is evident that many of the provisions of the contract are of such a nature that they could not be specifically enforced, and the court will not undertake to supervise the performance of such contracts, but, in a proper case where irreparable damages are shown, will enjoin a violation of a so-called negative covenant. Standard Fashion Co. v. Siegel-Cooper Co., 30 App. Div. 564, 52 N. Y. Supp. 433; affirmed, 157 N. Y. 60, 51 N. E. 408, 43 L. R. A. 854, 68 Am. St. Rep. 749; s. c., 44 App. Div. 121, 60 N. Y. Supp. 739.

I am fully convinced that, in accordance with the equities now disclosed by the amended complaint, the allegations of fact being admitted by the demurrer, the complainant company is entitled to relief by injunction restraining the violation by defendant company of the negative covenants referred to, unless the complainant has full and adequate remedy at law for the breach of such covenant, and unless equitable relief is not demanded to prevent a multiplicity of actions. The doctrine or principle obtains in all the cases of this description—contracts relating to personal property and the manufacture and sale thereof or the granting of special privileges—that, to warrant equitable relief by way of injunction restraining the violation of negative covenants, the complainant must be without full, complete, and adequate remedy in an action at law. The purpose of an injunction in such cases is to prevent irreparable injury. Standard Fashion Co. v. Siegel-Cooper Co., 157 N. Y. 60, 51 N. E. 408, 43 L. R. A. 854, 68 Am. St. Rep. 749; affirming 30 App. Div. 564, 52 N. Y. Supp. 433; Sternberg v. O'Brien, 48 N. J. Eq. 370, 22 Atl. 348; Marble Co. v. Ripley, 10 Wall. 339, 359, 19 L. Ed. 955; 22 Cyc. 846, 849: Bronk v. Riley, 50 Hun, 489, 3 N. Y. Supp. 446; World's Columbian Exposition v. U. S., 56 Fed. 654, 6 C. C. A. 58; J. T. Hair Co. v. Huckins, 56 Fed. 366, 5 C. C. A. 522.

It has been said, but I think not well decided in any case like this, that breach of negative covenants in a contract will be enjoined even though damages at law would be an adequate remedy. See cases cited in note 30, 22 Cyc. 846; but these cases are distinguishable, as stated in that note and note 31, in the following language:

"It is submitted that in many of these cases the statement will be found to be a mere obiter dictum, while in others it is so in essence, for the reason that the cases dealt with restrictive covenants as to the use of land (see infra, V. C. 7), or with contracts not to conduct a certain trade or business in competition with the complainant (see infra, V. C. 8), in which classes of contracts it is not necessary to prove substantial or irreparable injury, because it is presumed to be irreparable from the very nature of the subject-matter of the contract. * * *

"The conflict in the decisions as to contracts for personal service containing a negative clause has turned upon the question of whether or not the services were so unique as to make the damage irreparable in case of breach. See infra, V. C. 6."

In 22 Cyc. 849, 850, the rule is laid down, and I think correctly, that:

"Since the jurisdiction of equity to enjoin a breach of contract depends upon the inadequacy of the remedy at law, no injunction will be granted when the damages can be exactly ascertained, and no irreparable injury will be inflicted, and there is nothing that will give rise to a multiplicity of actions. The complainant must make an affirmative showing that the remedy at law is not adequate, except in cases where the very nature of the subject-matter has led courts to presume that damages would not compensate, as in the case of contracts affecting the use and enjoyment of real property, and contracts not to open up a competing business."

It remains then to consider (1) has complainant company full, complete, and adequate remedy at law? and, if so, (2) should the injunction be granted to prevent a multiplicity of actions? It must appear upon the face of the complaint (here the complaint and entire contract forming a part thereof), from the facts stated or shown, not mere conclusions stated, that the complainant has no such legal remedy, or that the breach complained of will necessitate a multiplicity of actions. In 22 Cyc., 928, 929, the following rules are well stated, citing many cases, viz.:

"(B) Inadequacy of Remedy at Law. As the jurisdiction of equity depends on the lack of an adequate remedy at law, a bill for an injunction must state facts from which the court can determine that the remedy at law is inadequate. If the inadequacy of the legal remedy depends on defendant's insolvency, the fact of insolvency must be positively alleged.

"(C) Irreparable Injury. An injunction will not be granted unless the complaint shows that a refusal to grant the writ will work irreparable injury. It is not sufficient simply to allege that the injury will be irreparable, but the facts must be stated so that the court may see that the apprehension of irreparable injury is well founded."

In considering the demurrer to the original bill of complaint herein, this court necessarily passed upon the question whether or not the provision contained in such contract as to damages is in fact for stipulated and liquidated damages or a mere penalty. General Electric Company v. Westinghouse Electric Co. (C. C.) 144 Fed. 458. This court then held, with but a small part of the entire agreement before it, and in the absence of all allegations as to patents and patent rights and releases and expenditures of money, and as to the objects and purposes of the entire agreement, and as to the covenant of the complainant company not to manufacture overhead trolleys etc., that the provision is one for liquidated damages; one the parties intelligently made, and one they had a right to make; and one which they deliberately intended as a provision for liquidated damages in case of a breach of the specific covenant, and not as a penalty. With the added facts pleaded, and with the entire contract before it, and after a careful consideration of all the terms of the agreement, its purposes as disclosed thereby, especially the recitals, and the circumstances under which it was entered into, as disclosed by such recitals, this court is asked to reverse or change its decision on that point. It is

true that the question is one of intent; and that intent is to be gathered from the entire instrument, the situation of the parties, and from the circumstances disclosed attending its execution; the objects and purposes to be attained are to be considered, as well as the consideration for the agreement. Did the parties contemplate performance in all events, and was performance essential to the general scheme and the attainment of the main objects, or did they contemplate nonperformance and substitute the payment of liquidated damages for performance, in lieu of performance? Have the parties agreed that the sum provided to be paid in case of breach is the price of nonperformance? Long v. Bowring, 33 Beavans, 585; Gray v. Crosby, 18 Johns. (N. Y.) 219, 225; Phœnix Ins. Co. v. Continental Ins. Co., 87 N. Y. 400, 405; Tayloe v. Sandiford, 7 Wheat. 13, 17, 5 L. Ed. 384; Sun Publishing Co. v. Moore, 183 U. S. 642, 662, 663, 22 Sup. Ct. 240, 46 L. Ed. 366; Diamond Match Co. v. Roeber, 106 N. Y. 473, 486, 13 N. E. 419, 60 Am. Rep. 464.

It is necessary to see exactly what the Westinghouse, or defendant, company agreed not to do, (2) what it is doing, and (3) what acts the damages specified cover. It agreed not to manufacture for use in the United States any electric brakes, or certain specified controllers, or any controller involving a blow-out device. It agreed to sell these devices manufactured by complainant company to the exclusion of all others. The complainant company owned or controlled patents for these devices, and upon sales it depended for profits, but it did not depend wholly upon sales to defendant company. It had the right, and retained the right, to manufacture and sell to others. The defendant company, in violation of this agreement or stipulation in the contract, is making and selling for use in the United States these very controllers, and, the complainant not having violated its agreement to make and supply defendant therewith, the defendant company is not only violating the agreement not to make and sell, but is infringing the patents of complainant company. In so doing it is also entering into competition with complainant company in making and selling these patented devices in the general market, which right of manufacture and sale belongs, outside of the agreement, to complainant company solely. This affects the value of complainant's patents to it, and deprives it of profits and the control of its own patents. It has granted no license to defendant company to do this, unless the agreement as to "liquidated damages" implies a license agreement and a license fee or compensation. The agreement as to the payment of damages is that in case the Westinghouse, defendant company, sells any controllers "in violation of this agreement," then "it shall pay to the other party as liquidated damages and not as a penalty, fifty per cent. of the price at which such controllers * * * are, at the time, being regularly sold to users by the party entitled under this agreement to the exclusive manufacture of the same." Should it happen that complainant company was not "at the time" selling controllers "regularly to users," there would be no measure of damages fixed by the agreement, and the parties and courts would perhaps resort to the nearest time of such sales; but in case of no sales by complainant company "to users," but only to dealers, or of no sales to either, for any reason, or for the reason the

defendant company had cut prices and monopolized trade in defiance of its agreement, then there would be no measure of damages agreed upon and no liquidated damages. But the defendant company not only violates the agreement by making and selling controllers, but asserts a right to continue to manufacture and sell, and "threatens and asserts a right to continue to sell for use in the United States, large numbers of controllers not manufactured by the complainant company." The bill of complainant alleges that this is a violation of its rights under its patents and a threat to continue such violation of such rights, and this is evidently true, appearing from the allegations of fact, unless the agreement as to damages impliedly licenses the defendant to make and sell the devices in question. But the sum named, to be ascertained in the way mentioned, and which may not be ascertainable at all, is not denominated a license fee, and the defendant company makes no tender of payment; does not claim, but repudiates, a license agreement. Hence full and adequate compensation in damages are not provided for in the agreement itself, and there is no pretense of any provision for liquidated damages for some of the defendant company's acts alleged in the bill of complaint and admitted by the demurrer. It is decisively settled that a party working or operating under a license from a patentee cannot deny his title or the validity of his patents. Kinsman v. Parkhurst, 18 How. (U. S.) 289, 292, 293, 294, 15 L. Ed. 385; Brown v. Lapham (C. C.) 27 Fed. 77; Platt v. Fire Ex. Co., 59 Fed. 897, 8 C. C. A. 357. I do not think the clause as to damages is a provision for a penalty, nor is it necessary so to hold. The decisive proposition is that it is not a substitute for performance. It was not so intended, and this is evident when we consider the entire agreement with its objects. Nor does a resort thereto afford complainant company either a full or an adequate remedy. The injunction which works no hardship to defendant prevents wrongs and affords a more full and perfect remedy. The allegations of want of adequate remedy at law are sufficient, being admitted by the demurrer and not negatived by the facts stated. Town of Mentz v. Cook, 108 N. Y. 504, 507, 508, 15 N. E. 541.

And hence we come to another question, the propriety and necessity of the injunction prayed for to avoid a multiplicity of actions. If the breach by defendant involved only successive actions for the recovery of the stipulated damages under the contract, this court would reaffirm its prior holding in this case on that question (141 Fed. 458), but it now appears that defendant's acts in violation of the contract will precipitate not only numerous actions between the parties for damages, the amount and nature of which are not easily determined or ascertainable, and which are not liquidated or even adequate, but actions at law or in equity, and perhaps both, for the infringement of complainant's patent rights, some of which the complaint alleges, and the demurrer admits, have been obtained and perfected by complainant company since the agreement was entered into, and relying thereon, and for the very purpose of fulfilling it according to its spirit and intent. And, again, the agreement has for its declared object and purpose, among others, the settlement and avoidance of such disputes and suits; and, relying on performance of the agreement, complainant com-

pany surrendered, as stated, claims for past infringements, and also expended large sums of money and put itself in a position from which it cannot now recede. That surrender and release is as follows:

"VI. Each party hereto irrevocably releases the other from all claims which it has, or can have, for royalties, profits or damages for the past infringement or use of any patents or patent rights owned or controlled by it, including the patents expressly excepted from the other provisions of this agreement, excepting only foreign patents. The mutual releases herein contained shall extend to, and be binding upon, all of the controlled companies of each of the parties hereto. Any agreements now existing for the payment of any royalties by the General Company, or by any of its controlled companies, to the Westinghouse Company or to any of its controlled companies, or by the Westinghouse Company, or by any of its controlled companies, to the General Company or to any of its controlled companies, are hereby abrogated in so far as they require such payment."

The complainant is entitled to the benefit of the consideration which it has given, and which cannot be, or at lea t has not been, restored. The damages stipulated are not a compen.ation therefor, nor were they intended to be. As this case now stands I do not regard the case Sun Printing & Publishing Association v. Moore, 183 U. S. 642, 22 Sup. Ct. 240, 46 L. Ed. 366, as at all controlling. In that case Moore delivered to the Sun Association a yacht which it agreed to return, and in the contract it was specially agreed that the value of the yacht was $75,000. This was fixed as the damages in case of a nonreturn. The yacht was not returned, and a libel in personam was filed against the Sun Association, and the damages were averred to be $75,000, the value of the yacht as fixed by the charter party. On the trial the learned judge refused to admit, or, having admitted, refused to consider, evidence as to the actual value of the yacht, and held that the damages were agreed upon and liquidated by the parties themselves in the contract. This holding was affirmed by the Supreme Court of the United States. I do not see how the court could have done otherwise. That was not a case for an injunction to restrain the violation of one stipulation in a contract which had been partly performed by both parties, and which one party was ready and willing and able to perform, and where the violation of the stipulation defeated the purpose or objects of the parties and deprived one of them of the benefits of the consideration for the making of the entire agreement, and which had not been and could not be restored. Nor was it a case where the violation of the covenant, would precipitate numerous actions between the parties, the avoidance of which was one of the main purposes of the agreement. In that case the party agreeing to return the yacht had failed so to do, and performance on his part was impossible. The question was simply the measure of damages for nonperformance. In that case there was no question that the parties had agreed that the payment of a certain sum of money agreed upon as the value of the yacht should be paid in any event in lieu of performance, the return of the yacht. As this case is now presented, I am of the opinion and hold that the stipulation in the agreement as to damages was not intended to be full compensation for nonperformance of the stipulation referred to; that the provision as to damages does not afford full, complete, or adequate remedy at law; and that the injunc-

tion prayed for is not only proper for that reason, but for the further reason that it is necessary and proper to prevent a multiplicity of actions. I am also of the opinion that the injunction prayed for is justified upon the further ground that it will tend to compel performance by the defendant company, and thus carry into effect the true intent and purpose of the parties in making the agreement.

The demurrer is therefore overruled, but defendant, on payment of the costs of the demurrer, may answer within 20 days after being, served with a copy of the order overruling the demurrer.